# GARNER ET AL. *v.* LOUISIANA.

No. 26.   Argued October 18–19, 1961.—Decided December 11, 1961.*

---

*Together with No. 27, *Briscoe et al.* v. *Louisiana,* and No. 28, *Hoston et al.* v. *Louisiana,* also on certiorari to the same Court.

*Jack Greenberg* argued the cause for petitioners. With him on the briefs were *A. P. Tureaud, Thurgood Marshall, William T. Coleman, James A. Nabrit III* and *Louis H. Pollak.*

*John F. Ward, Jr.* argued the cause for respondent. With him on the briefs were *Jack P. F. Gremillion,* Attorney General of Louisiana, and *N. Cleburn Dalton,* Assistant Attorney General.

Briefs of *amici curiae,* urging reversal, were filed by *Solicitor General Cox, Assistant Attorney General Marshall, Bruce J. Terris, Harold H. Greene* and *Howard A. Glickstein* for the United States, and by *John R. Fernbach* and *Murray A. Gordon* for the Committee on the Bill of Rights of the Association of the Bar of the City of New York.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

These cases come to us from the Supreme Court of Louisiana and draw in question the constitutionality of the petitioners' convictions in the 19th Judicial District Court, Parish of East Baton Rouge, Louisiana, for the crime of disturbing the peace. The petitioners[1] were brought to trial and convicted on informations charging them with violating Title 14, Article 103 (7), of the Louisiana Criminal Code, 1942, in that "they refused to move from a cafe counter seat . . . after having been ordered to do so by the agent [of the establishment]; said conduct being in such manner as to unreasonably and foreseeably disturb the public . . . ." In accordance with state procedure, petitioners sought post-conviction review in the Supreme Court of Louisiana through writs of certiorari, mandamus and prohibition. They contended that the

---

[1] Unless otherwise indicated, the term "petitioners" refers to the petitioners in all three cases, Nos. 26, 27 and 28.

State had presented no evidence to support the findings of statutory violation, and that their convictions were invalid on other constitutional grounds, both state and federal. Relief was denied. Federal questions were properly raised and preserved throughout the proceedings, and timely petitions for certiorari filed in this Court were granted. 365 U. S. 840. The United States Government appeared as *amicus curiae* urging, on various grounds, that the convictions be reversed. An *amicus* brief also urging reversal was filed by the Committee on the Bill of Rights of the Association of the Bar of the City of New York.

In our view of these cases and for our disposition of them, the slight variance in the facts of the three cases is immaterial. Although the alleged offenses did not occur on the same day or in the same establishment, the petitioners were all arrested by the same officers, charged with commission of the same acts, represented by the same counsel, tried and convicted by the same judge, and given identical sentences. Because of this factual similarity and the identical nature of the problems involved in granting certiorari, we ordered the cases consolidated for argument and now deem it sufficient to file one opinion. In addition, as the facts are simple, we think it sufficient to recite but one of the cases in detail, noting whatever slight variations exist in the others.

In No. 28, *Hoston et al.* v. *Louisiana,* Jannette Hoston, a student at Southern University, and six of her colleagues took seats at a lunch counter in Kress' Department Store in Baton Rouge, Louisiana, on March 29, 1960.[2] In Kress', as in Sitman's Drug Store in No. 26

---

[2] In No. 26, *Garner et al.* v. *Louisiana,* the petitioners, two Negro students at Southern University, took seats at the lunch counter of Sitman's Drug Store in Baton Rouge, and in No. 27, *Briscoe et al.* v. *Louisiana,* the lunch counter at which the seven Negro students sought service was in the restaurant section of the Greyhound Bus Terminal in Baton Rouge.

where Negroes are considered "very good customers," a segregation policy is maintained only with regard to the service of food.[3]  Hence, although both stores solicit business from white and Negro patrons, and the latter as well as the former may make purchases in the general merchandise sections without discrimination,[4] the stores do not provide integrated service at their lunch counters.

The manager at Kress' store, who was also seated at the lunch counter, told the waitress to advise the students that they could be served at the counter across the aisle, which she did.  The petitioners made no response and remained quietly in their seats.  After the manager had finished his lunch, he telephoned the police and told them that "[some Negroes] were seated at the counter reserved for whites."  The police arrived at the store and ordered the students to leave.  The arresting officer testified that the petitioners did and said nothing except that one of them stated that she would like a glass of iced tea, but that he believed they were disturbing the peace "by sitting there."  When none of the petitioners showed signs of leaving their seats, they were placed under arrest and taken to the police station.  They were then charged with violating Title 14, Article 103 (7), of the Louisiana Criminal Code, a section of the Louisiana disturbance of the peace statute.

Before trial, the petitioners moved for a bill of particulars as to the details of their allegedly disruptive behavior and to quash the informations for failure to state any unlawful acts of which they could be constitutionally convicted.  The motions were denied, and the

---

[3] The same is true, of course, with regard to the bus terminal in No. 27.  The terminal itself caters to both races, but separate facilities are maintained for the service of food.

[4] In No. 26, one of the petitioners had purchased an umbrella in the drugstore just prior to taking his seat at the lunch counter, and had encountered no difficulty in making the purchase.

petitioners applied to the Supreme Court of Louisiana for writs of certiorari, prohibition and mandamus to review the rulings. The Supreme Court denied the writs on the ground that an adequate remedy was available through resort to its supervisory jurisdiction in the event of a conviction. The petitioners were then tried and convicted,[5] and sentenced to imprisonment for four months, three months of which would be suspended upon the payment of a fine of $100. Subsequent to their convictions, the Supreme Court, in denying relief on appeal, issued the following oral opinion in each case.

"Writs refused.

"This court is without jurisdiction to review facts in criminal cases. See Art. 7, Sec. 10, La. Constitution of 1921.

"The rulings of the district judge on matters of law are not erroneous. See *Town of Ponchatoula* vs. *Bates,* 173 La., 824, 138 So., 851." [6]

---

[5] Although the problem was exactly the same in all three cases, the trial judge appeared to use different formulae for concluding petitioners' guilt in each opinion. In No. 26, the acts of the petitioners were said to be "an act done in a manner *calculated to, and actually did,* unreasonably disturb and alarm the public." In No. 27, the very same conduct was said to be "an act on their part as would *unreasonably* disturb and alarm the public." In No. 28, it was declared that the conduct *"foreseeably* could alarm and disturb the public." (Emphasis added.)

[6] The opinions of the Supreme Court of Louisiana are not officially reported.

Under Art. 7, Sec. 10, of the Louisiana Constitution, the appellate jurisdiction of the Supreme Court over criminal cases extends only to questions of law, and then only where, *inter alia,* a fine exceeding three hundred dollars or imprisonment exceeding six months has been imposed. See *State* v. *Di Vincenti,* 232 La. 13, 93 So. 2d 676; *State* v. *Gaspard,* 222 La. 222, 62 So. 2d 281; *State* v. *Price,* 164 La. 376, 113 So. 882. The Louisiana Supreme Court has held that a question of law is presented, and that a case is thus reviewable, where the contention is that there is *no* evidence to support an element of the

Before this Court, petitioners and the *amici* have presented a number of questions claiming deprivation of rights guaranteed to petitioners by the First and Fourteenth Amendments to the United States Constitution.[7] The petitioners contend:

(a) The decision below affirms a criminal conviction based upon no evidence of guilt and, therefore, deprives them of due process of law as defined in *Thompson* v. *City of Louisville,* 362 U. S. 199.

(b) The petitioners were convicted of a crime under the provisions of a state statute which, as applied to their acts, is so vague, indefinite and uncertain as to offend the Due Process Clause of the Fourteenth Amendment.

(c) The decisions below conflict with the Fourteenth Amendment's guarantee of freedom of expression.

(d) The decision below conflicts with prior decisions of this Court which condemn racially discrim-

---

crime charged. *State* v. *Daniels,* 236 La. 998, 109 So. 2d 896; *State* v. *Brown,* 224 La. 480, 70 So. 2d 96; *State* v. *Sbisa,* 232 La. 961, 95 So. 2d 619, and cases cited at n. 6, 232 La., at 969–970, 95 So. 2d, at 622. See Comment, 19 La. L. Rev. 843 (1959). Despite the court's purported review of the questions of law in these cases, the degree of punishment inflicted would deprive the court of appellate jurisdiction under Art. 7, Sec. 10. However, the Supreme Court also has a general supervisory jurisdiction, exercised only in the sound discretion of the court (see *State* v. *Morgan,* 204 La. 499, 502, 15 So. 2d 866, 867), over all inferior courts under Art. 7, Sec. 10; it appears that this is the provision which the petitioners attempted to invoke with their extraordinary writs in these cases. See also Art. 7, Sec. 2, of the Louisiana Constitution.

[7] In addition to the petitioners' contentions the United States argues that in No. 27 the petitioners' arrests and convictions deprived them of their rights under the Interstate Commerce Act to service on a nondiscriminatory basis in a restaurant of a bus terminal operated as part of interstate commerce. Cf. *Boynton* v. *Virginia,* 364 U. S. 454.

inatory administration of State criminal laws in contravention of the Equal Protection Clause of the Fourteenth Amendment.

With regard to argument (d), the petitioners and the New York Committee on the Bill of Rights contend that the participation of the police and the judiciary to enforce a state custom of segregation resulted in the use of "state action" and was therefore plainly violative of the Fourteenth Amendment. The petitioners also urge that even if these cases contain a relevant component of "private action," that action is substantially infected with state power and thereby remains state action for purposes of the Fourteenth Amendment.[8]

In the view we take of the cases we find it unnecessary to reach the broader constitutional questions presented, and in accordance with our practice not to formulate a rule of constitutional law broader than is required by the precise facts presented in the record, for the reasons hereinafter stated, we hold that the convictions in these cases are so totally devoid of evidentiary support as to render them unconstitutional under the Due Process Clause of the Fourteenth Amendment.[9] As in *Thompson* v. *City of Louisville*, 362 U. S. 199, our inquiry does not turn on a question of sufficiency of evidence to support a conviction, but on whether these convictions rest upon any evidence which would support a finding that the petitioners'

---

[8] The Government, as well as petitioners, points out that in addition to state statutes requiring segregation in specific situations in Louisiana, the Louisiana Legislature in 1960 adopted the following preface to a joint resolution concerning the possible integration of any tax-supported facility in the State:

"WHEREAS, Louisiana has always maintained a policy of segregation of the races, and

"WHEREAS, it is the intention of the citizens of this sovereign state that such a policy be continued. . . ." Act No. 630 of 1960, to amend Article X of the Louisiana Constitution.

[9] See *Thompson* v. *City of Louisville*, 362 U. S. 199.

acts caused a disturbance of the peace. In addition, we cannot be concerned with whether the evidence proves the commission of some other crime, for it is as much a denial of due process to send an accused to prison following conviction for a charge that was never made as it is to convict him upon a charge for which there is no evidence to support that conviction.[10]

The respondent, in both its brief and its argument to this Court, implied that the evidence proves the elements of a criminal trespass. In oral argument it contended that the real question here "is whether or not a private property owner and proprietor of a private establishment has the right to serve only those whom he chooses and to refuse to serve those whom he desires not to serve for whatever reason he may determine."[11] That this is not a question presented by the records in these cases seems too apparent for debate. Even assuming it were the question, however, which it clearly is not, these convictions could not stand for the reason stated in *Cole* v. *Arkansas,* 333 U. S. 196.[12]

[10] Cf. *Cole* v. *Arkansas,* 333 U. S. 196, 201. See *Thompson* v. *City of Louisville,* 362 U. S. 199, 206, and the cases cited at footnote 13.

[11] Counsel for the respondent admitted on oral argument that the Louisiana trespass statute in force at the time of the petitioners' arrests would probably not have applied to these facts. Apparently, the Louisiana Legislature agreed, for, in 1960, subsequent to petitioners' acts, the legislature passed a new criminal trespass statute (La. Rev. Stat., 1950, § 14:63.3 (1960 Supp.)), which reads:

"No person shall without authority of laws go into or upon . . . any structure . . . which belongs to another . . . after having been forbidden to do so . . . by any owner, lessee, or custodian of the property or by any other authorized person. . . ."

We express no opinion whether, on the facts of these cases, the petitioners' conduct would have been unlawful under this statute.

[12] The Supreme Court of Louisiana has also held that an accused may not be convicted on pleadings which fail to state the specific crime with which he is charged. *State* v. *Morgan,* 204 La. 499, 15 So. 2d 866 (1943).

Under our view of these cases, our task is to determine whether there is any evidence in the records to show that the petitioners, by their actions at the lunch counters in the business establishments involved, violated Title 14, Article 103 (7), of the Louisiana Criminal Code. At the time of petitioners' acts, Article 103 provided:

"Disturbing the peace is the doing of any of the following in such a manner as would foreseeably disturb or alarm the public:

"(1) Engaging in a fistic encounter; or

"(2) Using of any unnecessarily loud, offensive, or insulting language; or

"(3) Appearing in an intoxicated condition; or

"(4) Engaging in any act in a violent and tumultuous manner by any three or more persons; or

"(5) Holding of an unlawful assembly; or

"(6) Interruption of any lawful assembly of people; or

"(7) Commission of any other act in such a manner as to unreasonably disturb or alarm the public."

## I.

Our initial inquiry is necessarily to determine the type of conduct proscribed by this statute and the elements of guilt which the evidence must prove to support a criminal conviction thereunder. First, it is evident from a reading of the statute that the accused must conduct himself in a manner that would "foreseeably disturb or alarm the public." In addition, when a person is charged with a violation of Paragraph 7, an earlier version of which was aptly described by the Supreme Court of Louisiana as "the general portion of the statute which does not define the 'conduct or acts' the members of the Legislature had in mind" (*State* v. *Sanford,* 203 La. 961, 967, 14 So. 2d

·778, 780),[13] it would also seem apparent from the words of the statute that the acts, whatever they might be, must be done "in such a manner as to [actually] unreasonably disturb or alarm the public." However, because we find the records barren of any evidence that would support a finding that the petitioners' conduct would even "foreseeably" have disturbed the public, we need not consider whether the statute also requires the acts to be done in a manner as actually to disturb the peace.

We of course are bound by a State's interpretation of its own statute and will not substitute our judgment for that of the State's when it becomes necessary to analyze the evidence for the purpose of determining whether that evidence supports the findings of a state court. Hence, we must look to Louisiana for guidance in the meaning of the phrase "foreseeably disturb or alarm the public" in order to determine the type of conduct proscribed by La. Rev. Stat., 1950, § 14:103 (7).

The Supreme Court of Louisiana has had occasion in the past, in interpreting the predecessor of Article 103,[14] to give content to these words, and it is evident from the court's prior treatment of them that they were not

[13] We express no view as to the constitutionality of the petitioners' convictions as attacked by their argument that the statute (§ 103 (7)) is so vague and uncertain, with its resulting lack of notice of what conduct the legislature intended to make criminal, as to violate due process. Cf. *Lanzetta* v. *New Jersey*, 306 U. S. 451; *Musser* v. *Utah*, 333 U. S. 95; *Winters* v. *New York*, 333 U. S. 507.

[14] The predecessor of Title 14, Section 103, was Act No. 227 of 1934, which provided, *inter alia*, "That any person who shall go into any public place, [or] into or near any private house . . . and who shall [shout, swear, expose himself, discharge a firearm] . . . or who shall do any other act, in a manner calculated to disturb or alarm the inhabitants thereof, or persons present . . ." should be adjudged guilty of breaching the peace. In *State* v. *Sanford*, 203 La. 961, 14 So. 2d 778, discussed immediately following in the text, the defendants were charged, as were the petitioners in the cases at bar, under the general, catch-all provision.

intended to embrace peaceful conduct. On the contrary, it is plain that under the court's application of the statute these words encompass only conduct which is violent or boisterous in itself, or which is provocative in the sense that it induces a foreseeable physical disturbance.[15] In *State* v. *Sanford*, 203 La. 961, 14 So. 2d 778, the evidence showed that thirty Jehovah's Witnesses approached a Louisiana town for the purpose of distributing religious tracts and persuading the public to make contributions to their cause. The Witnesses were warned by the mayor and police officers that "their presence and activities would cause trouble among the population and asked them to stay away from the town . . . ." 203 La., at 964, 14 So. 2d, at 779. The Witnesses failed to yield to the warning and proceeded on their mission. The trial court found that the acts of the Witnesses in entering the town and stopping passers-by in the crowded street "might or would tend to incite riotous and disorderly conduct." 203 La., at 965, 14 So. 2d, at 779. The Supreme Court of Louisiana set aside convictions for breach of the peace, holding that the defendants did not commit any unlawful act or pursue any disorderly course of conduct which would tend to disturb the peace, thus, in effect, that peaceful conduct, even though conceivably offensive to another class of the public, is not conduct which may be proscribed by Louisiana's disturbance of the peace statute without evidence that the actor conducted himself in some outwardly unruly manner.

The conclusion of the highest Louisiana court that the breach of the peace statute does not reach peaceful and orderly conduct is substantiated by the conclusion drawn from reading the statute as a whole. The catch-all provision under which the petitioners were tried and con-

---

[15] See *Town of Ponchatoula* v. *Bates*, 173 La. 824, 138 So. 851 (dictum).

victed follows an enumeration of six specific offenses, each of which describes overtly tumultuous or disruptive behavior.   It would therefore normally be interpreted in the light of the preceding sections as an effort to cover other forms of violence or loud and boisterous conduct not already listed.[16]   We do not mean to imply that an *ejusdem generis* reading of the statute is constitutionally compelled to the exclusion of other reasonable interpretations,[17] but we do note that here such a reading is consistent with the Louisiana Supreme Court's application in *Sanford*.[18]

Further evidence that Article 103 (7) was not designed to encompass the petitioners' conduct in these cases has been supplied by the Louisiana Legislature.   Shortly after the events for which the petitioners were arrested took place, the legislature amended its disturbance of the peace statute in an obvious attempt to reach the type of activity involved in these cases.[19]   The contrast between the language of the present statute and the one under which the petitioners were convicted confirms the inter-

---

[16] See 2 Sutherland, Statutes and Statutory Construction, §§ 4909–4910 (Horack ed. 1943).

[17] Such an interpretation has not been made where there was evidence of a contrary legislative intent or judicial reading. *United States* v. *Alpers*, 338 U. S. 680, 682–683; *Gooch* v. *United States*, 297 U. S. 124, 128; *Helvering* v. *Stockholms Enskilda Bank*, 293 U. S. 84, 88–89.

[18] See also *Town of Ponchatoula* v. *Bates, supra,* note 15.

[19] La. Rev. Stat., 1950, § 14:103.1 (1960 Supp.), now reads, in pertinent part, as follows:

"A. Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby:

.          .          .          .          .

"(4) refuses to leave the premises of another when requested so to do by any owner, lessee, or any employee thereof, shall be guilty of disturbing the peace."

pretation given the general terms of the latter by the Supreme Court in *State* v. *Sanford* and the natural meaning of the words used in Article 103.

We are aware that the Louisiana courts have the final authority to interpret and, where they see fit, to reinterpret that State's legislation. However, we have seen no indication that the Louisiana Supreme Court has changed its *Sanford* interpretation of La. Rev. Stat., 1950, § 14:103 (7), and we will not infer that an inferior Louisiana court intended to overrule a long-standing and reasonable interpretation of a state statute by that State's highest court. Our reluctance so to infer is supported, moreover, by the fact that *State* v. *Sanford* was argued by the petitioners to both the trial court and the Supreme Court, and that neither court mentioned in its opinion that *Sanford* was no longer to be the law in Louisiana.

We think that the above discussion would give ample support to a conclusion that Louisiana law requires a finding of outwardly boisterous or unruly conduct in order to charge a defendant with "foreseeably" disturbing or alarming the public. However, because this case comes to us from a state court and necessitates a delicate involvement in federal-state relations, we are willing to assume with the respondent that the Louisiana courts might construe the statute more broadly to encompass the traditional common-law concept of disturbing the peace. Thus construed, it might permit the police to prevent an imminent public commotion even though caused by peaceful and orderly conduct on the part of the accused. Cf. *Cantwell* v. *Connecticut*, 310 U. S. 296, 308. We therefore treat these cases as though evidence of such imminent danger, as well as evidence of a defendant's active conduct which is outwardly provocative, could support a finding that the acts might "foreseeably disturb or alarm the public" under the Louisiana statute.

## II.

Having determined what evidence is necessary to support a finding of disturbing the peace under Louisiana law, the ultimate question, as in *Thompson* v. *City of Louisville, supra,* is whether the records in these cases contain any such evidence. With appropriate notations to the slight differences in testimony in the other two cases, we again turn to the record in No. 28.[20]   The manager of the department store in which the lunch counter was located testified that after the students had taken their seats at the "white lunch counter" where he was also occupying a seat, he advised the waitress on duty to offer the petitioners service at the counter across the aisle which served Negroes. The petitioners, however, after being "advised that they would be served at the other counter," remained in their seats, and the manager continued eating his lunch at the same counter.   In No. 26, where there were no facilities to serve colored persons, the petitioners were merely told that they couldn't be served, but were never even asked to move.   In No. 27, a waitress testified that the petitioners were merely told that they would have to go "to the other side to be served."   The petitioners not only made no speeches, they did not even speak to anyone except to order food; they carried no placards, and did nothing, beyond their mere presence at the lunch counter, to attract attention to themselves or to others.   In none of the cases was there any testimony that the petitioners were told that their mere presence was causing, or was likely to cause, a disturbance of the peace, nor that the petitioners were ever asked to leave the counters or the establishments by anyone connected with the stores.

---

[20] In all three cases the prosecution called as witnesses only the arresting officer and an employee from the restaurant in question. In none of the cases did the petitioners themselves testify or introduce any witnesses in their defense.

The manager in No. 28 testified that after finishing his meal he went to the telephone and called the police department, advising them that Negroes were in his store sitting at the lunch counter reserved for whites. This is the only case in which "the owner or his agent" notified the police of the petitioners' presence at the lunch counter, and even here the manager gave no indication to the officers that he feared any disturbance or that he had received any complaint concerning the petitioners' presence. In No. 27, a waitress testified that a bus driver sitting in the restaurant notified the police that "there were several colored people sitting at the lunch counter." [21] In No. 26, the arresting officers were not summoned to the drugstore by anyone even remotely connected with Sitman's but, rather, by a call from an officer on his "beat" who had observed the petitioners sitting quietly at the lunch counter.

Although the manager of Kress' Department Store testified that the only conduct which he considered disruptive was the petitioners' mere presence at the counter, he did state that he called the police because he "feared that some disturbance might occur." [22] However, his fear is completely unsubstantiated by the record. The manager continued eating his lunch in an apparently leisurely manner at the same counter at which the petitioners were sitting before calling the police. Moreover, not only did he fail to give the petitioners any warning of his alleged

---

[21] There is some inconsistency in the record, not material to our disposition of the case (see No. 28), as to who called the police; a police officer made a statement based on hearsay that the desk sergeant was called by "some woman."

[22] As noted previously, this is the only case in which a representative of the restaurant called the police. In addition, this is the only case in which there is anything in the record concerning the possibility of a disturbance, and even here it is limited to the manager's single statement noted above.

"fear," [23] but he specifically testified to the fact that the petitioners were never asked to move or to leave the store. Nor did the witness elaborate on the basis of his fear except to state that "it isn't customary for the two races to sit together and eat together." [24]   In addition, there is no evidence that this alleged fear was ever communicated to the arresting officers, either at the time the manager made the initial call to police headquarters or when the police arrived at the store.   Under these circumstances, the manager's general statement gives no support for the convictions within the meaning of *Thompson* v. *City of Louisville, supra.*

Subsequent to the manager's notification, the police arrived at the store and, without consulting the manager or anyone else on the premises, went directly to confront the petitioners.   An officer asked the petitioners to leave the counter because "they were disturbing the peace and violating the law by sitting there."   One of the students stated that she wished to get a glass of iced tea, but she and her friends were told, again by the police, that they were disturbing the peace by sitting at a counter reserved for whites and that they would have to leave.   When the petitioners continued to occupy the seats, they were arrested, as the officer testified, for disturbing the peace "[b]y sitting there" "because that place was reserved for white people."   The same officer testified that the petitioners had done nothing other than take seats at that particular lunch counter which he considered to be a breach of the peace.[25]

---

[23] Of course, even such a warning was not sufficient evidence to support a finding of breach of the peace in *State* v. *Sanford.*

[24] Compare the basis for the state action in *Buchanan* v. *Warley,* 245 U. S. 60, and *Cooper* v. *Aaron,* 358 U. S. 1.

[25] The evidence in the records in Nos. 26 and 27 is similar.   Each witness called by the State testified that the petitioners were arrested solely because they were Negroes sitting at a white lunch counter.

The respondent discusses at length the history of race relations and the high degree of racial segregation which exists throughout the South. Although there is no reference to such facts in the records, the respondent argues that the trial court took judicial notice of the general situation, as he may do under Louisiana law,[26] and that it therefore became apparent to the court that the petitioners' presence at the lunch counters might cause a disturbance which it was the duty of the police to prevent. There is nothing in the records to indicate that the trial judge did in fact take judicial notice of anything. To extend the doctrine of judicial notice to the length pressed by the respondent would require us to allow the prosecution to do through argument to this Court what it is required by due process to do at the trial, and would be "to turn the doctrine into a pretext for dispensing with a trial." *Ohio Bell Telephone Co.* v. *Public Utilities Comm'n,* 301 U. S. 292, 302. Furthermore, unless an accused is informed at the trial of the facts of which the court is taking judicial notice, not only does he not know upon what evidence he is being convicted, but, in addition, he is deprived of any opportunity to challenge the deductions drawn from such notice or to dispute the notoriety or truth of the facts allegedly relied upon. Moreover, there is no way by which an appellate court may review the facts and law of a case and intelligently decide whether the findings of the lower court are supported by the evidence where that evidence is unknown. Such an assumption would be a denial of due process. *Ohio Bell, supra.*

Thus, having shown that these records contain no evidence to support a finding that petitioners disturbed the peace, either by outwardly boisterous conduct or by pas-

---

[26] La. Rev. Stat., 1950, § 15:422 provides that Louisiana courts may take judicial notice of "social and racial conditions prevailing in [the] state." See *State* v. *Bessa et al.,* 115 La. 259, 38 So. 985.

sive conduct likely to cause a public disturbance, we hold that these convictions violated petitioners' rights to due process of law guaranteed them by the Fourteenth Amendment to the United States Constitution. The undisputed evidence shows that the police who arrested the petitioners were left with nothing to support their actions except their own opinions that it was a breach of the peace for the petitioners to sit peacefully in a place where custom decreed they should not sit.[27]   Such activity, in the circumstances of these cases, is not evidence of any crime and cannot be so considered either by the police or by the courts.

*The judgments are reversed.*

MR. JUSTICE FRANKFURTER, concurring in the judgment.

Whether state statutes are to be construed one way or another is a question of state law, final decision of which rests, of course, with the courts of the State.   When as here those courts have not spelled out the meaning of a statute, this Court must extrapolate its allowable meaning and attribute that to the highest court of the State. We must do so in a manner that affords the widest latitude to state legislative power consistent with the United States Constitution.

Since La. Rev. Stat., 1950, § 14:103 is concededly a statute aimed at "disturbing the peace," we begin with the breadth of meaning derived from that phrase in *Town of Ponchatoula* v. *Bates,* 173 La. 824, 138 So. 851 (1931). To be sure, that amounted to an abstract discussion and in the limited circumstances considered by the Louisiana Supreme Court in *State* v. *Sanford,* 203 La. 961, 14 So. 2d 778 (1943), the allowable scope of the statutory prohibition was not fully explored.   But construction of the statute to prohibit non-violent, non-religious behavior in a private shop when that behavior has a tendency to dis-

---

[27] Compare the evidence contained in the records in *Terminiello* v. *Chicago,* 337 U. S. 1; and in *Feiner* v. *New York,* 340 U. S. 315.

turb or alarm the public is fairly derivable from a reading of the *Sanford* opinion.

The action of the Louisiana Legislature in amending its statutes after the events now under review took place is not a safe or even relevant guide to the scope of the prior statute. Legislatures not uncommonly seek to make prior law more explicit or reiterate a prohibition by more emphatic concreteness. The rule of evidence that excludes proof of post-injury repairs offers a useful analogy here. See II Wigmore, Evidence, § 283 (Third ed. 1940). It is not our province to limit the meaning of a state statute beyond its confinement by reasonably read state-court rulings.

Assuming for present purposes the constitutionality of a statute prohibiting non-violent activity that tends to provoke public alarm or disturbance, such a tendency, as a crucial element of a criminal offense, must be established by evidence disclosed in the record to sustain a conviction. A judge's private knowledge, or even "knowledge by notoriety," to use Dean Wigmore's phrase, IX Evidence, § 2569 (Third ed. 1940), not presented as part of the prosecution's case capable of being met by a defendant, is not an adequate basis, as a matter of due process, to establish an essential element of what is punished as crime. *Thompson* v. *City of Louisville*, 362 U. S. 199.

It may be unnecessary to require formal proof, even as to an issue crucial in determining guilt in a criminal prosecution, of what is incontestably obvious. But some showing cannot be dispensed with when an inference is at all doubtful. And it begs the whole question on the answer to which the validity of these convictions turns to assume that the "public" tended to be alarmed by the conduct of the petitioners here disclosed. See Devlin, L. J., in *Dingle* v. *Associated Newspapers*, [1961] 2 Q. B. 162, 198. Conviction under this Louisiana statute cannot be sustained by reliance merely upon likely consequences in the generality of cases. Since particular per-

sons are being sent to jail for conduct allegedly having a particular effect on a particular occasion under particular circumstances, it becomes necessary to appraise that conduct and effect by the particularity of evidence adduced.

The records in these cases, whatever variance in unimportant details they may show, contain no evidence of disturbance or alarm in the behavior of the cafe employees or customers or even passers-by, the relevant "public" fairly in contemplation of these charges. What they do show was aptly summarized both in the testimony of the arresting police and in the recitation of the trial judge as the "mere presence" of the petitioners.

Silent persistence in sitting after service is refused could no doubt conceivably exacerbate feelings to the boiling point. It is not fanciful speculation, however, that a proprietor who invites trade in most parts of his establishment and restricts it in another may change his policy when non-violently challenged.* With records as barren as these of evidence from which a tendency to disturb or alarm the public immediately involved can be drawn, there is nothing before us on which to sustain such an inference from what may be hypothetically lodged in the unopened bosom of the local court.

Since the "mere presence" that these records prove has, in any event, not been made a crime by the Louisiana statute under which these petitioners were charged, their convictions must be reversed.

Mr. Justice Douglas, concurring.

If these cases had arisen in the Pacific Northwest—the area I know best—I could agree with the opinion of the Court. For while many communities north and south, east and west, at times have racial problems, those areas which have never known segregation would not be

---

*If it were clear from these records that the proprietors involved had changed their policies and consented to the petitioners' remaining, we would, of course, have an entirely different case.

inflamed or aroused by the presence of a member of a minority race in a restaurant. But in Louisiana racial problems have agitated the people since the days of slavery. The landmark case of *Plessy* v. *Ferguson,* 163 U. S. 537—the decision that announced in 1896 the now-repudiated doctrine of "separate but equal" facilities for whites and blacks—came from Louisiana which had enacted in 1890 a statute requiring segregation of the races on railroad trains. In the environment of a segregated community I can understand how the mere presence of a Negro at a white lunch counter might inflame some people as much as fisticuffs would in other places. For the reasons stated by MR. JUSTICE HARLAN in these cases, I read the Louisiana opinions as meaning that this law includes "peaceful conduct of a kind that foreseeably may lead to public disturbance"—a kind of "generally known condition" that may be "judicially noticed" even in a criminal case.

This does not mean that the police were justified in making these arrests. For the police are supposed to be on the side of the Constitution, not on the side of discrimination. Yet if all constitutional questions are to be put aside and the problem treated merely in terms of disturbing the peace, I would have difficulty in reversing these judgments. I think, however, the constitutional questions must be reached and that they make reversal necessary.

Restaurants, whether in a drugstore, department store, or bus terminal, are a part of the public life of most of our communities. Though they are private enterprises, they are public facilities in which the States may not enforce a policy of racial segregation.

## I.

It is, of course, state action that is prohibited by the Fourteenth Amendment, not the actions of individuals. So far as the Fourteenth Amendment is concerned, indi-

viduals can be as prejudiced and intolerant as they like. They may as a consequence subject themselves to suits for assault, battery, or trespass. But those actions have no footing in the Federal Constitution. The line of forbidden conduct marked by the Equal Protection Clause of the Fourteenth Amendment is crossed only when a State makes prejudice or intolerance its policy and enforces it, as held in the *Civil Rights Cases,* 109 U. S. 3. Mr. Justice Bradley, speaking for the Court, said: ". . . civil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, unsupported by State authority in the shape of laws, *customs,* or judicial or executive proceedings." *Id.,* at 17. (Italics added.)

State policy violative of the Fourteenth Amendment may be expressed in *legislative* enactments that permit or require segregation of the races in public places or public facilities (*Brown* v. *Board of Education,* 347 U. S. 483) or in residential areas. *Buchanan* v. *Warley,* 245 U. S. 60.

It may be expressed through *executive* action, as where the police or other law enforcement officials act pursuant to, or under color of, state law. See, *e. g., Screws* v. *United States,* 325 U. S. 91; *Monroe* v. *Pape,* 365 U. S. 167.

It may be expressed through the *administrative* action of state agencies in leasing public facilities. *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715.

It may result from *judicial action,* as where members of a race are systematically excluded from juries (*Hernandez* v. *Texas,* 347 U. S. 475), or where restrictive covenants based on race are enforced by the judiciary (*Barrows* v. *Jackson,* 346 U. S. 249), or where a state court fines or imprisons a person for asserting his federal right to use the facilities of an interstate bus terminal, *Boynton* v. *Virginia,* 364 U. S. 454.

As noted, Mr. Justice Bradley suggested in the *Civil Rights Cases, supra,* that state policy may be as effectively

expressed in *customs* as in formal legislative, executive, or judicial action.

It was indeed held in *Baldwin* v. *Morgan,* 287 F. 2d 750, 756, that the "custom, practice and usage" of a city and its police in arresting four Negroes for using "white" waiting rooms was state action in violation of the Fourteenth Amendment, even though no ordinance was promulgated and no order issued. In the instant cases such an inference can be drawn from the totality of circumstances permeating the environment where the arrests were made—not an isolated arrest but three arrests; not arrests on account of fisticuffs but arrests because the defendants were Negroes seeking restaurant service at counters and tables reserved for "whites."

There is a deep-seated pattern of segregation of the races in Louisiana,[1] going back at least to *Plessy* v. *Ferguson, supra.* It was restated in 1960—the year in which petitioners were arrested and charged for sitting in white restaurants—by Act No. 630, which in its preamble states:

> "WHEREAS, Louisiana has always maintained a policy of segregation of the races, and

---

[1] Article 135 of Louisiana's 1868 Constitution forbade segregation of the races in public schools. But that prohibition was dropped from Louisiana's 1879 Constitution. The latter by Article 231 authorized the establishment of a university for Negroes.

Woodward, Strange Career of Jim Crow (1955), pp. 7–8:

". . . In bulk and detail as well as in effectiveness of enforcement the segregation codes were comparable with the black codes of the old regime, though the laxity that mitigated the harshness of the black codes was replaced by a rigidity that was more typical of the segregation code. That code lent the sanction of law to a racial ostracism that extended to churches and schools, to housing and jobs, to eating and drinking. Whether by law or by custom, that ostracism eventually extended to virtually all forms of public transportation, to sports and recreations, to hospitals, orphanages, prisons, and asylums, and ultimately to funeral homes, morgues, and cemeteries."

"WHEREAS, it is the intention of the citizens of this sovereign state that such a policy be continued." La. Acts 1960, p. 1200.

Louisiana requires that all circuses, shows, and tent exhibitions to which the public is invited have one entrance for whites and one for Negroes. La. Rev. Stat., 1950, § 4:5. No dancing, social functions, entertainment, athletic training, games, sports, contests "and other such activities involving personal and social contacts" may be open to both races. § 4:451 (1960 Supp.). Any public entertainment or athletic contest must provide separate seating arrangements and separate sanitary drinking water and "any other facilities" for the two races. § 4:452 (1960 Supp.). Marriage between members of the two races is banned. § 14:79. Segregation by race is required in prisons. § 15:752. The blind must be segregated. § 17:10. Teachers in public schools are barred from advocating desegregation of the races in the public school system. §§ 17:443, 17:462. So are other state employees. § 17:523. Segregation on trains is required. §§ 45:528–45:532. Common carriers of passengers must provide separate waiting rooms and reception room facilities for the two races (§ 45:1301 (1960 Supp.)) and separate toilets and separate facilities for drinking water as well. § 45:1303 (1960 Supp.). Employers must provide separate sanitary facilities for the two races. § 23:971 (1960 Supp.). Employers must also provide separate eating places in separate rooms and separate eating and drinking utensils for members of the two races. § 23:972 (1960 Supp.). Persons of one race may not establish their residence in a community of another race without approval of the majority of the other race. § 33:5066. Court dockets must reveal the race of the parties in divorce actions. § 13:917. And all public parks, recreation centers, playgrounds, community centers and "other such facilities at which swimming, dancing, golfing, skating or other recreational activities are

conducted" must be segregated. § 33:4558.1 (1960 Supp.).

Though there may have been no state law or municipal ordinance that *in terms* required segregation of the races in restaurants, it is plain that the proprietors in the instant cases were segregating blacks from whites pursuant to Louisiana's custom. Segregation is basic to the structure of Louisiana as a community; the custom that maintains it is at least as powerful as any law. If these proprietors also choose segregation, their preference does not make the action "private," rather than "state," action. If it did, a miniscule of private prejudice would convert state into private action. Moreover, where the segregation policy is the policy of a State, it matters not that the agency to enforce it is a private enterprise. *Baldwin* v. *Morgan, supra; Boman* v. *Birmingham Transit Co.,* 280 F. 2d 531.

## II.

It is my view that a State may not constitutionally enforce a policy of segregation in restaurant facilities. Some of the argument assumed that restaurants are "private" property in the sense that one's home is "private" property. They are, of course, "private" property for many purposes of the Constitution. Yet so are street railways, power plants, warehouses, and other types of enterprises which have long been held to be affected with a public interest. Where constitutional rights are involved, the proprietary interests of individuals must give way. Towns, though wholly owned by private interests, perform municipal functions and are held to the same constitutional requirements as ordinary municipalities. *Marsh* v. *Alabama,* 326 U. S. 501. State regulation of private enterprise falls when it discriminates against interstate commerce. *Port Richmond Ferry* v. *Hudson County,* 234 U. S. 317. State regulation of private enterprise that results in impairment of other constitutional

rights should stand on no firmer footing, at least in the area where facilities of a public nature are involved.

Long before Chief Justice Waite wrote the opinion in *Munn* v. *Illinois,* 94 U. S. 113, holding that the prices charged by grain warehouses could be regulated by the State, a long list of businesses had been held to be "affected with a public interest." Among these were ferries, common carriers, hackmen, bakers, millers, wharfingers, and innkeepers. *Id.,* at 125. The test used in *Munn* v. *Illinois* was stated as follows: "Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large." *Id.,* at 126. In reply to the charge that price regulation deprived the warehousemen of property, Chief Justice Waite stated, "There is no attempt to compel these owners to grant the public an interest in their property, but to declare their obligations, if they use it in this particular manner." *Id.,* at 133.

There was a long span between *Munn* v. *Illinois* and *Nebbia* v. *New York,* 291 U. S. 502, which upheld the power of a State to fix the price of milk. A business may have a "public interest" even though it is not a "public utility" in the accepted sense, even though it enjoys no franchise from the State, and even though it enjoys no monopoly. *Id.,* at 534. The examples cover a wide range from price control to prohibition of certain types of business. *Id.,* at 525–529. Various systems or devices designed by States or municipalities to protect the wholesomeness of food in the interests of health are deep-seated as any exercise of the police power. *Adams* v. *Milwaukee,* 228 U. S. 572.

Years ago Lord Chief Justice Hale stated in *De Portibus Maris,* 1 Harg. Law Tracts 78, ". . . if a man set out a street in new building on his own land, it is now no longer bare private interest, but is affected with a public interest." Those who run a retail establishment under permit

from a municipality operate, in my view, a public facility in which there can be no more discrimination based on race than is constitutionally permissible in the more customary types of public facility.

Under Louisiana law, restaurants are a form of private property affected with a public interest. Local boards of health are given broad powers. La. Rev. Stat., 1950, §§ 40:35, 33:621. The City of Baton Rouge in its City Code requires all restaurants to have a permit. Tit. 6, c. 7, § 601. The Director of Public Health is given broad powers of inspection and permits issued can be suspended. *Id.* § 603. Permits are not transferable. *Id.* § 606. One who operates without a permit commits a separate offense each day a violation occurs. *Id.* § 604. Moreover, detailed provisions are made concerning the equipment that restaurants must have, the protection of ready-to-eat foods and drink, and the storage of food. *Id.* § 609.

Restaurants, though a species of private property, are in the public domain. Or to paraphrase the opinion in *Nebbia* v. *New York, supra,* restaurants in Louisiana have a "public consequence" and "affect the community at large." 291 U. S. 502, 533.

While the concept of a business "affected with a public interest" normally is used as a measure of a State's police power over it, it also has other consequences. A State may not require segregation of the races in conventional public utilities any more than it can segregate them in ordinary public facilities.[2] As stated by the court in

---

[2] We have held on numerous occasions that the States may not use their powers to enforce racial segregation in public facilities. *Mayor and City Council of Baltimore City* v. *Dawson,* 350 U. S. 877 (1955) (public beaches and bathhouses); *Holmes* v. *City of Atlanta,* 350 U. S. 879 (1955) (municipal golf courses); *Gayle* v. *Browder,* 352 U. S. 903 (1956) (buses operated on city streets); *New Orleans City Park Improvement Association* v. *Detiege,* 358 U. S. 54 (1958) (golf course and city parks). For decisions of the lower federal courts holding racial segregation unconstitutional as applied to facilities open

*Boman* v. *Birmingham Transit Co.*, 280 F. 2d 531, 535, a public utility "is doing something the state deems useful for the public necessity or convenience." It was this idea that the first Mr. Justice Harlan, dissenting in *Plessy* v. *Ferguson, supra,* advanced. Though a common carrier is private enterprise, "its work," he maintained, is public. *Id.,* at 554. And there can be no difference, in my view, between one kind of business that is regulated in the public interest and another kind so far as the problem of racial segregation is concerned. I do not believe that a State that licenses a business can license it to serve only whites or only blacks or only yellows or only browns. Race is an impermissible classification when it comes to parks or other municipal facilities by reason of the Equal Protection Clause of the Fourteenth Amendment. By the same token, I do not see how a State can constitutionally exercise its licensing power over business either in terms or in effect to segregate the races in the licensed premises. The authority to license a business for public use is derived from the public. Negroes are as much a part of that public as are whites. A municipality granting a license to operate a business for the public represents Negroes as well as all other races who live there. A license to establish a restaurant is a license to establish a public facility and necessarily imports, in law, equality of use for all members of the public. I see no way whereby licenses issued by a State to serve the public can be distinguished from leases of public facilities (*Burton* v. *Wilmington Parking Authority, supra*) for that end.

One can close the doors of his home to anyone he desires. But one who operates an enterprise under a

---

to public enjoyment and patronage, see *Department of Conservation & Development, Division of Parks, of Virginia,* v. *Tate,* 231 F. 2d 615 (state park); *City of St. Petersburg* v. *Alsup,* 238 F. 2d 830 (municipal beach and swimming pool); *Morrison* v. *Davis,* 252 F. 2d 102 (public transportation facilities).

license from the government enjoys a privilege that derives from the people. Whether retail stores, not licensed by the municipality, stand on a different footing is not presented here. But the necessity of a license shows that the public has rights in respect to those premises. The business is not a matter of mere private concern. Those who license enterprises for public use should not have under our Constitution the power to license it for the use of only one race. For there is the overriding constitutional requirement that all state power be exercised so as not to deny equal protection to any group. As the first Mr. Justice Harlan stated in dissent in *Plessy* v. *Ferguson, supra,* at 559, ". . . in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind . . . ."

MR. JUSTICE HARLAN, concurring in the judgment.

I agree that these convictions are unconstitutional, but not for the reasons given by the Court. Relying on *Thompson* v. *City of Louisville,* 362 U. S. 199, the Court strikes down the convictions on the ground that there is no evidence whatever to support them. In my opinion the *Thompson* doctrine does not fit these cases. However, I believe the convictions are vulnerable under the Fourteenth Amendment on other grounds: (1) the kind of conduct revealed in *Garner,* No. 26, and in *Hoston,* No. 28, could not be punished under a generalized breach of the peace provision, such as Art. 103 (7), La. Crim. Code; [1] (2) Art. 103 (7) as applied in *Briscoe,* No. 27 (as

[1] The Louisiana statute, La. Rev. Stat., 1950, § 14:103, then provided:

"Disturbing the peace is the doing of any of the following in such a manner as would foreseeably disturb or alarm the public:

well as in the *Garner* and *Hoston* cases) is unconstitutionally vague and uncertain.

The Court's reversal for lack of evidence rests on two different views of Art. 103 (7). First, it is said that the statute, as construed by the Louisiana courts, reaches at most only "violent," "boisterous," or "outwardly provocative" conduct that may foreseeably induce a public disturbance. On this view, these cases are found evidentially wanting because the petitioners' conduct, being entirely peaceful, was not of the character proscribed by the statute so construed. Alternatively, it is recognized that the statute is susceptible of a construction that would embrace as well other kinds of conduct having the above effect. On that view, the convictions are also found evidentially deficient, in that petitioners' conduct, so it is said, could not properly be taken as having any tendency to cause a public disturbance. In my opinion, the first of these holdings cannot withstand analysis with appropriate regard for the limitations upon our powers of review over state criminal cases; the second holding rests on untenable postulates as to the law of evidence.

## I.

Turning to the first holding, it goes without saying that we are not at liberty to determine for ourselves the scope

---

"(1) Engaging in a fistic encounter; or

"(2) Using of any unnecessarily loud, offensive, or insulting language; or

"(3) Appearing in an intoxicated condition; or

"(4) Engaging in any act in a violent and tumultuous manner by any three or more persons; or

"(5) Holding of an unlawful assembly; or

"(6) Interruption of any lawful assembly of people; or

"(7) Commission of any other act in such a manner as to unreasonably disturb or alarm the public.

"Whoever commits the crime of disturbing the peace shall be fined not more than one hundred dollars, or imprisoned for not more than ninety days, or both."

of this Louisiana statute. That was a function belonging exclusively to the state courts, and their interpretation is binding on us. *E. g., Appleyard* v. *Massachusetts,* 203 U. S. 222, 227; *Hebert* v. *Louisiana,* 272 U. S. 312, 316; *Williams* v. *Oklahoma,* 358 U. S. 576, 583. For me, the Court's view that the statute covers only nonpeaceful conduct is unacceptable, since I believe that the Louisiana Supreme Court decided the opposite in these very cases. I think the State Supreme Court's refusal to review these convictions, taken in light of its assertion that the "rulings of the district judge on matters of law are not erroneous," must be accepted as an authoritative and binding state determination that the petitioners' activities, as revealed in these records, did violate the statute; in other words that, contrary to what this Court now says in Part I of its opinion, the enactment *does* cover peaceful conduct of a kind that foreseeably may lead to public disturbance.[2]

This Court's view of the statute rests primarily, if not entirely, on an earlier Louisiana case, *State* v. *Sanford,* 203 La. 961, 14 So. 2d 778, involving a different, but comparable, breach of the peace statute. That case is regarded as establishing that breaches of the peace under Louisiana law are confined to nonpeaceful conduct. While I do not find the *Sanford* case as "plain" as the Court does (*infra,* pp. 191–192), that earlier holding cannot in any event be deemed controlling on the significance to be attributed to the action of the State Supreme Court in

---

[2] As Mr. Justice Jackson put it in *Gryger* v. *Burke,* 334 U. S. 728, 731:

"We are not at liberty to conjecture that the trial court acted under an interpretation of the state law different from that which we might adopt and then set up our own interpretation as a basis for declaring that due process has been denied. We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question."

*these* cases. There can be no doubt that Louisiana had to follow the principles of *Sanford* only to the extent that it felt bound by *stare decisis*. A departure from precedent may have been wrong, unwise, or even unjust, but it was not unconstitutional. *Patterson* v. *Colorado,* 205 U. S. 454, 461.[3] See also *Brinkerhoff-Faris Trust Co.* v. *Hill,* 281 U. S. 673, 680, and cases there cited; cf. *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.,* 287 U. S. 358, 364.

More basically, established principles of constitutional adjudication require us to consider that the Louisiana Supreme Court's refusal to review these cases signifies a holding that the breach of the peace statute which controls these cases does embrace the conduct of the petitioners, peaceful though it was.

These state judgments come to us armored with a presumption that they are not founded "otherwise than is required by the fundamental law of the land," *Ex parte Royall,* 117 U. S. 241, 252 (see also *Darr* v. *Burford,* 339 U. S. 200, 205), comparable to the presumption which has always attached to state legislative enactments. See, *e. g., Butler* v. *Pennsylvania,* 10 How. 402, 415. That presumption should render impermissible an interpretation of these judgments as resting on the view that the relevant breach of the peace statute reaches only unruly

---

[3] There Mr. Justice Holmes said of a claim that a state court was constitutionally obliged to follow its own precedents: "Even if it be true, as the plaintiff in error says, that the Supreme Court of Colorado departed from earlier and well-established precedents to meet the exigencies of this case, whatever might be thought of the justice or wisdom of such a step, the Constitution of the United States is not infringed. It is unnecessary to lay down an absolute rule beyond the possibility of exception. Exceptions have been held to exist. But in general the decision of a court upon a question of law, however wrong and however contrary to previous decisions, is not an infraction of the Fourteenth Amendment merely because it is wrong or because earlier decisions are reversed."

behavior. For, on the Court's premise that there is no evidence of that kind of behavior, such an interpretation in effect attributes to the Louisiana Supreme Court a deliberately unconstitutional decision, under principles established by *Thompson* v. *City of Louisville, supra,* which had already been decided at the time these cases came before the Louisiana courts.

Moreover, the kind of speculation in which the Court has indulged as to the meaning of the Louisiana statute is surely out of keeping with the principle that federal courts should abstain from constitutional decision involving doubtful state law questions until a clarifying adjudication on them has first been obtained from the state courts. See *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496, 500; *Harrison* v. *N. A. A. C. P.,* 360 U. S. 167. Cf. *Glenn* v. *Field Packing Co.,* 290 U. S. 177; *Leiter Minerals, Inc.,* v. *United States,* 352 U. S. 220, 228–229; *Louisiana Power & Light Co.* v. *City of Thibodaux,* 360 U. S. 25. If there be doubt as to how the statute was construed in this respect, the cases should be returned to the Louisiana Supreme Court for clarification of its judgments. See *Herb* v. *Pitcairn,* 324 U. S. 117.

Our recent decision in *Thompson* v. *City of Louisville,* 362 U. S. 199, cannot well be taken as justification for considering the judgments under review as other than a holding by Louisiana's highest court that breach of the peace under then existing state law may include conduct that in itself is peaceful. In *Thompson,* the petitioner was convicted of two offenses defined by ordinances of the City of Louisville. One of these ordinances, prohibiting loitering, expressly enumerated three elements of the offense. The prosecution introduced no evidence to establish any of these definitely prescribed components, which were not suggested to have, by virtue of state judicial interpretation, any other than their plain meaning. We held that "Under the words of the ordinance itself," there was no evidence to support the conviction.

The other offense of which the petitioner in *Thompson* was convicted was "disorderly conduct," not at all defined in the ordinance. The only evidence in the record relating to conduct which might conceivably have come within the prohibited scope indicated was that the petitioner was "argumentative" with the arresting officers. We said of this conviction (362 U. S., at 206): "We assume, for we are justified in assuming, that merely 'arguing' with a policeman is not, because it could not be, 'disorderly conduct' as a matter of the substantive law of Kentucky. See *Lanzetta* v. *New Jersey*, 306 U. S. 451." In other words, we held that the ordinance could not, for want of adequate notice, *constitutionally* be construed by the Kentucky courts to cover the activity for which the city sought to punish the petitioner.

Where, as was true of the disorderly conduct charge in *Thompson*, application of a generally drawn state statute or municipal ordinance to the conduct of a defendant would require a constitutionally impermissible construction of the enactment, we are not bound by the state court's finding that the conduct was criminal. In the cases now before us, however, the Court does not suggest that Louisiana's disturbance of the peace statute was too vague to be constitutionally applied to the conduct of the petitioners. I think we are obliged, because of the state courts' dispositions of these cases, to hold that there was presented at petitioners' trials evidence of criminal conduct under Louisiana law. *Herndon* v. *Lowry*, 301 U. S. 242, 255.

*Thompson* v. *Louisville* should be recognized for what it is, a case involving a situation which, I think it fair to say, was unique in the annals of the Court. The case is bound to lead us into treacherous territory, unless we apply its teaching with the utmost circumspection, and with due sense of the limitations upon our reviewing authority.

The Court's holding on this phase of the matter also suffers from additional infirmities. I do not think that *State* v. *Sanford,* the cornerstone of this branch of the Court's opinion, is as revealing upon the meaning of breach of the peace under Louisiana law as the Court would make it seem. In that case the Louisiana Supreme Court reversed the convictions, under the then breach of the peace statute, of four Jehovah's Witnesses who had solicited contributions and distributed pamphlets in a Louisiana town, with an opinion which cited, *inter alia, Cantwell* v. *Connecticut,* 310 U. S. 296, and *Martin* v. *Struthers,* 319 U. S. 141. Reference was made to "the provisions of the Constitution of the United States guaranteeing freedom of religion, of the press and of speech." 203 La., at 968, 14 So. 2d, at 780. The court said, most clearly, "The application of the statute by the trial judge to the facts of this case and his construction thereof would render it unconstitutional under the above Federal authorities." 203 La., at 970, 14 So. 2d, at 780–781. In addition, the opinion noted, conviction under the statute might violate the Louisiana Constitution "because it is well-settled that no act or conduct, however reprehensible, is a crime in Louisiana, unless it is defined and made a crime clearly and unmistakably by statute." 203 La., at 970, 14 So. 2d, at 781. In the concluding part of its opinion the Louisiana Supreme Court also said what this Court now considers to be the sole ground of its decision: "It is our opinion that the statute is inapplicable to this case because it appears that the defendants did not commit any unlawful act or pursue an unlawful or disorderly course of conduct which would tend to disturb the peace." 203 La., at 970, 14 So. 2d, at 781.

Thus, a full reading of *Sanford* will disclose that there were at least three considerations which led to the result: (1) the likelihood that a contrary holding would violate provisions of the Federal Constitution relating to religion,

speech, and press under the principles declared in then-recent decisions of this Court; (2) the possibility that the statute was too vague and unclear under the Louisiana Constitution adequately to define the bounds of the conduct being declared criminal; (3) the unfairness of convicting under a general breach of the peace statute persons engaged in such peaceable religious activity.

The Court now isolates this last factor from this multifaceted opinion, and, using it as an immutable measure of what Louisiana law requires, declares that the present convictions must fall because the standard so unclearly set out in *Sanford* has not been met. Apart from other considerations already discussed, I am not prepared to rest a constitutional decision on so insecure a foundation.

It is further significant that the State Supreme Court's order refusing to review the present cases does not cite *State* v. *Sanford,* but rather relies on another earlier case, *Town of Ponchatoula* v. *Bates,* 173 La. 824, 138 So. 851. The *Bates* decision, upholding the constitutionality of an ordinance making it a crime "to engage in a fight or in any manner disturb the Peace," defined disturbance of the peace as "any act or conduct of a person which molests the inhabitants in the enjoyment of that peace and quiet to which they are entitled, or which throws into confusion things settled, or which causes excitement, unrest, disquietude, or fear among persons of ordinary, normal temperament." 173 La., at 828, 138 So., at 852. Such a definition would of course bring within the compass of the statute even peaceful activity, so long as it threw "into confusion things settled," or caused disquietude among ordinary members of the community. I think it was that construction which the Louisiana Supreme Court placed upon the breach of the peace statute involved in the cases now before us.

## II.

The alternative holding of the Court in Part II of its opinion also stands on unsolid foundations. Conceding that this breach of the peace statute "might" be construed to cover peaceful conduct carried on "in such a manner as would foreseeably disturb or alarm the public," the Court holds that there was no evidence that petitioners' conduct tended to disturb or alarm those who witnessed their activity.

There is, however, more to these cases than what physically appears in the record. It is an undisputed fact that the "sit-in" program, of which petitioners' demonstrations were a part, had caused considerable racial tension in various States, including Louisiana. Under Louisiana law, La. Rev. Stat., 1950, § 15:422, Louisiana courts may take judicial notice of "the political, social and racial conditions prevailing in this state." *State* v. *Bessa*, 115 La. 259, 38 So. 985. This Court holds, nonetheless, that the Louisiana courts could not, consistently with the procedural guarantees of the Fourteenth Amendment, judicially notice the undisputed fact that there was racial tension in and around Baton Rouge on March 28 and 29, 1960 (the dates of these "sit-ins"), without informing the parties that such notice was being taken, and without spreading the source of the information on the record.

Support for this constitutional proposition is found in *Ohio Bell Telephone Co.* v. *Public Utilities Commission*, 301 U. S. 292, 302–303. The Court there held that it was repugnant to the Fourteenth Amendment for a state agency to deprive the telephone company of property on the basis of rates set by a precise mathematical computation derived from undisclosed statistics. This was because the procedure afforded no opportunity for rebuttal with respect to the underlying data, and for possible demonstra-

tion that the figures should not be judicially noticed, since their source was unknown and the statistics were not disclosed to any reviewing court. See Morgan, Some Problems of Proof (1956), 56.

The situation we have here is quite different. The existence of racial tensions, of which the Louisiana courts must have taken judicial notice in order to find that petitioners' conduct alarmed or disturbed the public, was notorious throughout the community and, indeed, throughout that part of the United States. The truth of that proposition is not challenged, nor is any particular authority required to confirm it. This kind of generally known condition may be judicially noticed by trial and appellate courts without prior warning to the parties, since it does not require any foundation establishing the accuracy of a specific source of information. See Uniform Rules of Evidence, 9 (2)(c); ALI, Model Code of Evidence, Rule 802 (c); 1 Morgan, Basic Problems of Evidence (1954), 9–10. Cf. *Mills* v. *Denver Tramway Corp.*, 155 F. 2d 808 (C. A. 10th Cir.). I perceive no reason why that principle should be considered as applying only in civil cases, and I am not aware of any American authority which so holds.

Indeed, the fact of which I think we must consider judicial notice was taken in this instance was so notorious throughout the country that far from its being unconstitutional for a court to take it into consideration, it would be quite amiss for us not to deem that the Louisiana courts did so on their own initiative. See, *e. g.*, Uniform Rules of Evidence, 9 (1); cf. Note, 12 Va. L. Rev. 154 (1925), and cases there cited. It might have been procedurally preferable had the trial judge announced to the parties that he was taking judicial notice, as is suggested in Model Code of Evidence, Rule 804. But we would be exalting the sheerest of technicalities were we to hold that a conviction is constitutionally

void because of a judge's failure to declare that he has noticed a common proposition when, at no stage in the proceeding, is it suggested that the proposition may be untrue. Whether a trial judge need notify the parties of his intention to take judicial notice of "routine matters of common knowledge which . . . [he] would notice as a matter of course" is best left to his "reasonable discretion." McCormick, Evidence (1954), 708. Appellate courts have always reserved the authority to notice such commonly known propositions as are needed to support the judgment of a lower court, even if no express reference has been made below. See Comment, 42 Mich. L. Rev. 509, 512–513 (1943).

Moreover, in this instance, the fact that the trial court had taken judicial notice of the impact of petitioners' conduct, which indeed had obviously been engaged in for the very purpose of producing an impact on others in this field of racial relations, albeit, I shall assume, with the best of motives, could hardly have failed to cross the minds of petitioners' counsel before the trial had ended. They however neither sought to introduce countervailing evidence on that issue, nor have they undertaken at any stage of these proceedings, including that in this Court, to question the availability of judicial notice on this aspect of the State's case.

Were we to follow the reasoning of the majority opinion where it would logically lead, this Court would be violating due process every time it noticed a generally known fact without first calling in the parties to apprise them of its intention. Yet without any such notification this Court has many times taken judicial notice of well-known economic and social facts, *e. g., Atchison, Topeka & S. F. R. Co.* v. *United States,* 284 U. S. 248, 260; *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, 398–400; *Hoyt* v. *Florida, ante,* p. 57, at p. 62, and even of the tendency of

particular epithets to cause a breach of the peace. *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 574.

It is no answer to say in these cases that while it was permissible for the Louisiana courts to take judicial notice of racial conditions generally, they could not take notice of the particular conditions on the premises involved in these prosecutions. In the absence of contrary evidence, it was certainly not constitutionally impermissible for the Louisiana courts to consider that the racial conditions in Baton Rouge and in the establishments where petitioners sat were not dissimilar to those existing throughout the State. Judicial notice of racial conditions in a State has sufficient probative value in determining what were the racial conditions at a particular location within the State to withstand constitutional attack. Reversing these convictions for want of evidence of racial tension would in effect be putting this Court into the realm of reviewing the *sufficiency* of the evidence to support these convictions, something which both *Thompson* v. *City of Louisville, supra,* at 199, and the Court's opinion in the present cases, *ante,* p. 163, recognize is not properly within our purview.

In my opinion, skimpy though these records are, the convictions do not fall for want of evidence, in the constitutional sense.

### III.

Were there no more to these cases, I should have to vote to affirm. But in light of principles established by *Cantwell* v. *Connecticut,* 310 U. S. 296, and consistently since recognized, I think the convictions are subject to other constitutional infirmities.

At the outset it is important to focus on the precise factual situation in each of these cases. Common to all three are the circumstances that petitioners were given the invitation extended to the public at large to patronize

these establishments; that they were told that they could be served food only at the Negro lunch counters; that their conduct was not unruly or offensive; and that none of them was ever asked by the owners or their agents to leave the establishments. While in *Briscoe*, No. 27, there was some very slight, but in my view constitutionally adequate, evidence that those petitioners were expressly asked "to move" from the "white" lunch counter,[4] and undisputed evidence that they did not do so, in *Garner*, No. 26, and *Hoston*, No. 28, there was no evidence whatever of any express request to the petitioners in those cases that they move from the "white" lunch counters where they were sitting.

Nor do I think that any such request is fairly to be implied from the fact that petitioners were told by the management that they could not be served food at such counters. The premises in both instances housed merchandising establishments, a drugstore in *Garner*, a department store in *Hoston*, which solicited business from all comers to the stores. I think the reasonable inference is that the management did not want to risk losing Negro patronage in the stores by requesting these petitioners to leave the "white" lunch counters, preferring to rely on the hope that the irritations of white customers or the

---

[4] In *Briscoe*, the waitress who had spoken to the defendants testified at the trial that she told them "they would have to go to the other side to be served." It was only when she responded affirmatively to a leading question, "And you told them you couldn't serve them and asked them to move, is that correct?" that she provided any evidence at all to support a finding that the defendants were even asked by the management to move from the "white" lunch counter. Contrary to what the trial court in *Briscoe* may have meant when it said that the defendants "were requested to leave and they refused to leave" before the police appeared, the waitress' laconic reply furnished no evidence whatever that the defendants were requested to leave the establishments.

force of custom would drive them away from the counters.[5] This view seems the more probable in circumstances when, as here, the "sitters' " behavior was entirely quiet and courteous, and, for all we know, the counters may have been only sparsely, if to any extent, occupied by white persons.[6]

In short, I believe that in the *Garner* and *Hoston* cases the records should be taken as indicating that the petitioners remained at the "white" lunch counters with the

---

[5] The owner of the drugstore in *Garner* testified that his store provided eating "facilities for only one race, the white race," and that when petitioners sat down at the lunch counter he "advise[d] them that we couldn't serve them." He admitted that "negroes are very good customers" in the drugstore section of the establishment. In *Hoston,* the manager of the department store repeatedly insisted at the trial that the petitioners had *not* been "requested to move over to the counter reserved for colored people." When asked, "They weren't asked to go over there?" he replied, "They were advised that we would serve them over there." He denied that the petitioners had been "refused" service: "We did not refuse to serve them. I merely did not serve them and told them that they would be served on the other side of the store. . . . As I stated before, we did not refuse to serve them. We merely advised them they would be served on the other side of the store."

In contrast to what appears in *Garner* and *Hoston,* the circumstances in *Briscoe* seem to me quite different. There is little reason to believe that the management of a restaurant in a Greyhound Bus Terminal would be nearly as concerned with offending Negro patrons because of their refusal to sit at the Negro counter as would the management of a merchandising establishment dependent on other trade than that available at its eating facilities. It may well have been assumed that pique at being asked to leave a "white" lunch counter would readily yield to the need of having to use the buses to get to one's destination. Further, for all that appears, the restaurant and bus companies, in this instance, may have been entirely separate enterprises, or these "sitters" may only have been "eaters" and not "travelers" as well.

[6] In *Garner* there was evidence that "a number of customers [were] seated at the counter." In *Hoston* there was no evidence even of that kind.

implied consent of the management,[7] even though a similar conclusion may not be warranted in the *Briscoe* case. Under these circumstances, applying principles announced in *Cantwell*, I would hold all these convictions offensive to the Fourteenth Amendment, in that: (1) in *Garner* and *Hoston* petitioners' conduct, occurring with the managements' implied consent, was a form of expression within the range of protections afforded by the Fourteenth Amendment which could in no event be punished by the State under a *general* breach of the peace statute; and (2) in *Briscoe*, while petitioners' "sitting," over the management's objection, cannot be deemed to be within the reach of such protections, their convictions must nonetheless fall because the Louisiana statute, as there applied (and *a fortiori* as applied in the other two cases), was unconstitutionally vague and uncertain.

In the *Cantwell* case a Jehovah's Witness had been convicted for breach of the peace under a Connecticut statute embracing what was considered to be the common-law concept of that offense.[8] "The facts which were held

---

[7] The manager of the department store in *Hoston* seemed particularly complacent. Although two Negro girls sat "adjoining" him while he was eating lunch at the counter, he finished his meal before calling the police. He instructed a waitress "to offer service at the counter across the aisle," but never approached the petitioners himself. He testified that his purpose in calling the police was that he "feared that some disturbance might occur."

[8] The Connecticut statute, Conn. Gen. Stat., § 6194 (1930), provided:

"Any person who shall disturb or break the peace by tumultuous and offensive carriage, noise or behavior, or by threatening, traducing, quarreling with, challenging, assaulting or striking another *or shall disturb or break the peace*, or provoke contention, by following or mocking any person, with abusive or indecent language, gestures or noise, or shall, by any writing, with intent to intimidate any person, threaten to commit any crime against him or his property or shall write or print and publicly exhibit or distribute, or shall publicly exhibit, post up or advertise, any offensive, indecent or abusive matter

to support the conviction . . . were that he stopped two men in the street, asked, and received, permission to play a phonograph record, and played the record 'Enemies,' which attacked the religion and church of the two men, who were Catholics. Both were incensed by the contents of the record and were tempted to strike Cantwell [the defendant] unless he went away. On being told to be on his way he left their presence. There was no evidence that he was personally offensive or entered into any argument with those he interviewed." 310 U. S., at 302–303.

Accepting the determination of the state courts that although the defendant himself had not been disorderly or provocative, his conduct under Connecticut law nonetheless constituted a breach of the peace because of its tendency to inflame others, this Court reversed. Starting from the premise that the "fundamental concept of liberty embodied in [the Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment," the Court found that the defendant's activities fell within the protection granted to the "free exercise" of religion. Then recognizing the danger to such liberties of "leaving to the executive and judicial branches too wide a discretion" in the application of a statute "sweeping in a great variety of conduct under a general and indefinite characterization," the Court held that the defendant's activities could not constitutionally be reached under a general breach of the peace statute, but only under one specifically and narrowly aimed at such conduct. 310 U. S., at 307–308. The Court stated:

> "Although the contents of the [phonograph] record not unnaturally aroused animosity, we think that, in

---

concerning any person, shall be fined not more than five hundred dollars or imprisoned in jail not more than one year or both." (Emphasis added.)

the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question." [Citing to such cases as *Schenck* v. *United States*, 249 U. S. 47.] 310 U. S., at 311.

I think these principles control the *Garner* and *Hoston* cases. There was more to the conduct of those petitioners than a bare desire to remain at the "white" lunch counter and their refusal of a police request to move from the counter. We would surely have to be blind not to recognize that petitioners were sitting at these counters, where they knew they would not be served, in order to demonstrate that their race was being segregated in dining facilities in this part of the country.

Such a demonstration, in the circumstances of these two cases, is as much a part of the "free trade in ideas," *Abrams* v. *United States*, 250 U. S. 616, 630 (Holmes, J., dissenting), as is verbal expression, more commonly thought of as "speech." It, like speech, appeals to good sense and to "the power of reason as applied through public discussion," *Whitney* v. *California*, 274 U. S. 357, 375 (Brandeis, J., concurring), just as much as, if not more than, a public oration delivered from a soapbox at a street corner. This Court has never limited the right to speak, a protected "liberty" under the Fourteenth Amendment, *Gitlow* v. *New York*, 268 U. S. 652, 666, to mere verbal expression. *Stromberg* v. *California*, 283 U. S. 359; *Thornhill* v. *Alabama*, 310 U. S. 88; *West Virginia State Board of Education* v. *Barnette*, 319 U. S. 624, 633–634. See also *N. A. A. C. P.* v. *Alabama*, 357 U. S. 449, 460.

If the act of displaying a red flag as a symbol of opposition to organized government is a liberty encompassed within free speech as protected by the Fourteenth Amendment, *Stromberg* v. *California, supra,* the act of sitting at a privately owned lunch counter with the consent of the owner, as a demonstration of opposition to enforced segregation, is surely within the same range of protections. This is not to say, of course, that the Fourteenth Amendment reaches to demonstrations conducted on private property over the objection of the owner (as in *Briscoe*), just as it would surely not encompass verbal expression in a private home if the owner has not consented.

No one can deny the interest that a State has in preserving peace and harmony within its borders. Pursuant to this interest, a state legislature may enact a trespass statute, or a disturbance of the peace statute which either lists in detail the acts condemned by legitimate state policy or proscribes breaches of the peace generally, thus relating the offense to the already developed body of common law defining that crime. Or it may, as Louisiana has done, append to a specific enumeration in a breach of the peace statute a "catch-all" clause to provide for unforeseen but obviously disruptive and offensive behavior which cannot be justified, and which is not within the range of constitutional protection.

But when a State seeks to subject to criminal sanctions conduct which, except for a demonstrated paramount state interest, would be within the range of freedom of expression as assured by the Fourteenth Amendment, it cannot do so by means of a general and all-inclusive breach of the peace prohibition. It must bring the activity sought to be proscribed within the ambit of a statute or clause "narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State." *Cantwell* v. *Connecticut, supra,* at 311; *Thornhill* v. *Alabama,* 310

U. S. 88, 105.[9]   And of course that interest must be a legitimate one.   A State may not "suppress free communication of views, religious or other, under the guise of conserving desirable conditions."   *Cantwell, supra,* at 308.

These limitations exist not because control of such activity is beyond the power of the State, but because sound constitutional principles demand of the state legislature that it focus on the nature of the otherwise "protected" conduct it is prohibiting, and that it then make a legislative judgment as to whether that conduct presents so clear and present a danger to the welfare of the community that it may legitimately be criminally proscribed.[10]

---

[9] Compare, for example, the statutes upheld in *Beauharnais* v. *Illinois,* 343 U. S. 250; *Breard* v. *Alexandria,* 341 U. S. 622; *Kovacs* v. *Cooper,* 336 U. S. 77; *Valentine* v. *Chrestensen,* 316 U. S. 52; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568; *Cox* v. *New Hampshire,* 312 U. S. 569.

[10] Mr. Justice Roberts, speaking for a unanimous Court in *Cantwell,* stated (310 U. S., at 307–308):

"Conviction on the fifth\count [disorderly conduct] was not pursuant to a statute evincing a legislative judgment that street discussion of religious affairs, because of its tendency to provoke disorder, should be regulated, or a judgment that the playing of a phonograph on the streets should in the interest of comfort or privacy be limited or prevented.   Violation of an Act exhibiting such a legislative judgment and narrowly drawn to prevent the supposed evil, would pose a question differing from that we must here answer.   Such a declaration of the State's policy would weigh heavily in any challenge of the law as infringing constitutional limitations.   Here, however, the judgment is based on a common law concept of the most general and undefined nature.   The court below has held that the petitioner's conduct constituted the commission of an offense under the state law, and we accept its decision as binding upon us to that extent.

"The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility.   It includes not only violent acts but acts and words likely to produce violence in others.   No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical

The Louisiana Legislature made no such judgment before the petitioners in *Garner* and *Hoston* engaged in their "sit-in" activity. In light of the *Cantwell* case, whose reasoning of course cannot be deemed limited to "expression" taking place on the public streets, cf. *Terminiello* v. *Chicago,* 337 U. S. 1, *Niemotko* v. *Maryland,* 340 U. S. 268, 281 (concurring opinion), Louisiana could not, in my opinion, constitutionally reach those petitioners' conduct under subsection (7)—the "catch-all clause"—of its then existing disturbance of the peace statute.[11] In so concluding, I intimate no view as to whether Louisiana could by a specifically drawn statute constitutionally proscribe conduct of the kind evinced in these two cases, or upon the constitutionality of the statute which the State has recently passed.[12] I deal here only with these two cases, and the statute that is before us now.

---

attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious. Equally obvious is it that a State may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions. Here we have a situation analogous to a conviction under a statute sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application."

[11] It follows, of course, that petitioners' refusal to accede to the request to leave made by police officers could also not constitutionally be punished under this general statute. Were it otherwise, the determination whether certain conduct constitutes a clear and present danger would be delegated to a police officer. Simply by ordering a defendant to cease his "protected" activity, the officer could turn a continuation of that activity into a breach of the peace.

[12] After the incidents which gave rise to these cases, the Louisiana Legislature passed a bill adding to the disturbance of the peace statute a second clause, La. Rev. Stat., 1950, § 14:103B (1960 Supp.), which provides:

"B. Any person or persons . . . while in or on the premises of another . . . on which property any store, restaurant, drug store . . . or

## IV.

Finally, I believe that the principles of *Cantwell* lead to the conclusion that this general breach of the peace provision must also be deemed unconstitutional for vagueness and uncertainty, *as applied* in the circumstances of all these cases. As to *Garner* and *Hoston* this affords an alternative ground for reversal. As to *Briscoe,* where the evidence falls short of establishing that those petitioners remained at the "white" lunch counter with the .express or implied consent of the owner (notes 4, 5, *supra*), I would rest reversal solely on this ground.[13]

While *Cantwell* was not explicitly founded on that premise, it seems to me implicit in the opinion that a statute which leaves the courts in uncertainty as to whether it was intended to reach otherwise constitutionally protected conduct must by the same token be deemed inadequate warning to a defendant that his conduct has

---

any other lawful business is operated which engages in selling articles of merchandise or services or accommodation to members of the public, or engages generally in business transactions with members of the public, who shall:

"(1) prevent or seek to prevent, or interfere or seek to interfere with the owner or operator of such place of business, or his agents or employees, serving or selling food and drink . . . or

"(2) prevent or seek to prevent, or interfere or seek to interfere with other persons who are expressly or impliedly invited upon said premises, or with prospective customers coming into or frequenting such premises in the normal course of the operation of the business conducted and carried on upon said premises, shall be guilty of disorderly conduct and disturbing the peace . . . ." 1 La. Acts, 1960, 235–236.

[13] Because of the absence of any evidence in the *Briscoe* record regarding the legal relationship between the restaurant and the Greyhound Bus Terminal in Baton Rouge, on whose premises it was located, I would not pass in this case on the Solicitor General's suggestion, made as *amicus curiae,* that segregated facilities were prohibited by § 216 (d) of Part II of the Interstate Commerce Act, 49 U. S. C. § 316 (d). See *Boynton* v. *Virginia,* 364 U. S. 454.

been condemned by the State. See *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 573–574. Cf. *Winters* v. *New York,* 333 U. S. 507, 509–510; *Smith* v. *California,* 361 U. S. 147, 151; *Thompson* v. *City of Louisville,* 362 U. S. 199, 206. Such warning is, of course, a requirement of the Fourteenth Amendment. *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453.

This conclusion finds added support in the cases requiring of state legislatures more specificity in statutes impinging on freedom of expression than might suffice for other criminal enactments. See *Winters* v. *New York, supra,* at 509–510; *Smith* v. *California, supra,* at 151; cf. *Herndon* v. *Lowry,* 301 U. S. 242, 261–264. To the extent that this Louisiana statute is explicit on the subject of expression it prohibits only that which is "unnecessarily loud, offensive, or insulting" or activity carried on "in a violent or tumultuous manner by any three or more persons" (note 1, *supra*). No charge was made or proved that petitioners' conduct met any of those criteria. Nor has the statute been elucidated in this respect before, or since, petitioners' conviction, by any decision of the Louisiana courts of which we have been advised. Cf. *Winters* v. *New York, supra,* at 514; *Terminiello* v. *Chicago,* 337 U. S. 1, 4. Lastly, it is worth observing that in *State* v. *Sanford* the Louisiana Supreme Court seriously questioned on the score of vagueness the validity of that earlier breach of the peace statute under the State Constitution, as there applied to conduct within the same range of constitutional protection.[14]

In the absence of any Louisiana statute purporting to express the State's overriding interest in prohibiting peti-

---

[14] I do not intend to suggest that the present Louisiana statute, either on its face or as it might be applied with respect to conduct not within the "liberty" assured by the Fourteenth Amendment, is or would be unconstitutional for vagueness. Cf. *Winters* v. *New York, supra,* at 524–526 (dissenting opinion).

tioners' conduct as a clear and present danger to the welfare of the community, peaceful demonstration on public streets, and on private property with the consent of the owner, was constitutionally protected as a form of expression. Louisiana's breach of the peace statute drew no distinct line between presumably constitutionally protected activity and the conduct of the petitioners in *Briscoe*, as a criminal trespass statute might have done.[15] The fact that in *Briscoe*, unlike *Garner* and *Hoston*, the management did not consent to the petitioners' remaining at the "white" lunch counter does not serve to permit the application of this general breach of the peace statute to the conduct shown in that case. For the statute by its terms appears to be as applicable to "incidents fairly within the protection of the guarantee of free speech," *Winters* v. *New York, supra*, at 509, as to that which is not within the range of such protection. Hence such a law gives no warning as to what may fairly be deemed to be within its compass. See Note, 109 U. of Pa. L. Rev. 67, 75–76, 99–104 (1960).

For the foregoing reasons I dissent from the opinion of the Court, but join in the judgment.

---

[15] The criminal trespass statute in force in Louisiana at the time of petitioners' acts prohibited only "unauthorized and intentional taking [of] possession" and "unauthorized and intentional entry" on another's property. La. Rev. Stat., 1950, § 14:63. No attempt was made to prosecute the petitioners under this law. The statute has since been amended to cover "remaining in places after being forbidden," 1 La. Acts, 1960, 245–248, and an anti-trespass provision is now included in the disturbance of the peace statute, 1 La. Acts, 1960, 234.