The four defendants were tried together in a trial to the court, and each was found guilty on a charge of disorderly conduct in violation of § 53-175 of the General Statutes, which provides: "Any person who, by offensive or disorderly conduct, annoys or interferes with any person in any place . . ., although such conduct may not amount to an assault and battery, shall be . . . [punished]." Two claims of error are pursued in this appeal: (1) that the facts as found do not as a matter of law constitute disorderly conduct; and (2) that the court erred "in concluding upon all the *Page 338 
evidence that the . . . [defendants were] guilty of the crime charged beyond a reasonable doubt."
The facts as shown by the record are short and simple. On February 8, 1962, the defendants Petty, Jackson and Ackerman, together with three unidentified persons, entered the common waiting room of the downtown office of Arthur T. Barbieri, Inc., a real estate firm, which shared office space with two lawyers and was located at 109 Church Street, in New Haven. Arthur T. Barbieri is the chairman of the Democratic town committee. Of the six persons who entered the waiting room, some sat on chairs, others on the floor. None of the six had any business or professional engagements with any of the occupants of the office suite. A business patron of Barbieri, upon leaving his private office, was obliged to climb over one or more of the "sit-ins" in order to get to the outside door. Upon instructions from Barbieri, his secretary summoned the police. William Doerrer, a detective of the New Haven police department, responded to the call. He found six people in the common waiting room; three were seated on chairs and three sat on the floor. He asked them to withdraw voluntarily because their conduct was disruptive of the business of the establishment. Three left of their own accord. Petty, Ackerman and Jackson remained. Again, Doerrer told them to leave. They refused. Their arrest for disorderly conduct followed. Jackson told Doerrer, in the presence of Ackerman and Petty, that he, Jackson, knew he "was wrong in performing a sit-in demonstration in an office," and added, "This thing had to be brought to a head." The evidence suggests, though not too clearly, that Petty, Ackerman and Jackson were staging a "sit-in" demonstration to protest against certain features of a local housing ordinance for which they blamed both major political parties, though the evidence is notably *Page 339 
silent as to the specific details of the "sit-in" program. On the same date, the defendant Moss and five unidentified persons entered the waiting room of Henry DeVita, a lawyer who, in partnership with another attorney under the firm name of DeVita and Melnick, also had offices at 109 Church Street, in New Haven. The six were seated in the waiting room for about an hour. There is nothing in the record to indicate or suggest that any of them were there for business purposes. Doerrer asked them to leave. Five left voluntarily. Only Moss remained. He was again requested to leave. He refused. His arrest followed.
In none of the cases did the defendants themselves testify or introduce any evidence in their defense.
Upon these facts, which were undisputed, the court concluded that the defendants entered the business premises without any semblance of right or purpose; that they interfered with the normal business procedure in effect in both offices; and that they were guilty of the crime charged beyond a reasonable doubt.
We are aware that the term "disorderly conduct" is not one of precise meaning. It has been variously defined in different jurisdictions and no definition is generally accepted which is of such precision that it may readily be determined whether particular conduct is or is not disorderly. See Hughes v.Georgia Power Co., 65 Ga. App. 163, 166. The most comprehensive definition of the offense appears in Model Penal Code § 250.2 (1962) as follows: "(1) Offense Defined. A person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he (a) engages in fighting or threatening, or in a violent and tumultuous behavior; *Page 340 
or (b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor. `Public' means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood." In People v.Harvey, 307 N.Y. 588, 591, the New York Court of Appeals, in construing § 720 of the New York Penal Law, which is practically identical with our § 53-175, said, quoting from People v. St. Clair, 90 App. Div. 239,243: "`Two things must occur to constitute the crime [of disorderly conduct]. One of these relates to the conduct of the accused, and the other to the effect of such conduct upon the complainant. There must be an annoyance to or interference with some person in a public place by act or language which is either offensive or disorderly.'" See State v.Robinson, 23 Conn. Sup. 430; State v. Avnayim,24 Conn. Sup. 7.
Twice in the last two years, the United States Supreme Court has reversed state criminal convictions on due process grounds where the convictions were totally devoid of evidentiary support. Thompson
v. Louisville, 362 U.S. 199; Garner v. Louisiana,368 U.S. 157. The first case involved an alleged violation of municipal and disorderly conduct ordinances. Thompson, a poor Negro, was arrested in a small cafe while waiting for a bus. He was charged with loitering there without the consent of the tavern proprietor and with failure to give a satisfactory account of himself to a police officer who found him doing a "shuffle dance" in rhythm with the music of a jukebox. This charge was so *Page 341 
utterly devoid of evidentiary support that the Supreme Court set aside the conviction as a violation of due process. There was also a disorderly conduct charge, based on the arresting officer's testimony that when Thompson was taken into custody he "was very argumentative — he argued with us back and forth and so then we placed a disorderly conduct charge on him." Mr. Justice Black, speaking for the court, in setting aside the disorderly conduct conviction said (p. 205): "Petitioner's conviction for disorderly conduct was under § 85-8 of the city ordinance which, without definition, provides that `[w]hoever shall be found guilty of disorderly conduct in the City of Louisville shall be fined . . .' etc. The only evidence of `disorderly conduct' was the single statement of the policeman that after petitioner was arrested and taken out of the cafe he was very argumentative. There is no testimony that petitioner raised his voice, used offensive language, resisted the officers or engaged in any conduct of any kind likely in any way to adversely affect the good order and tranquillity of the City of Louisville. . . . We assume, for we are justified in assuming, that merely `arguing' with a policeman is not, because it could not be, `disorderly conduct' as a matter of the substantive law of Kentucky." "In other words," said Mr. Justice Harlan, concurring in the judgment in Garner, supra, 190, "we held that the ordinance [in which disorderly conduct was not defined] could not, for want of adequate notice, constitutionally be construed by the Kentucky courts to cover the activity for which the city sought to punish the petitioner." See note, "The Void-for-Vagueness Doctrine in the Supreme Court," 109 U. Pa. L. Rev. 67. But the question of the constitutionally of our disorderly conduct statute, which also lacks a definition of disorderly conduct, while originally made the subject of an assignment *Page 342 
of error, was abandoned on oral argument and was not pursued in the brief. Thus the constitutional issue is not before us.
The second case, Garner v. Louisiana, supra, involved violations of a statute on disturbing the peace. The statute (La. Rev. Stat. § 14:103 [1950]) provided that "[d]isturbing the peace is the doing of any of the following in such a manner as would foreseeably disturb or alarm the public . . . [enumerating certain specific acts] or (7) [c]ommission of any other act in such a manner as to unreasonably disturb or alarm the public." The facts were undisputed. The petitioners, who were Negroes, took seats at a segregated lunch bar in a privately owned department store. They were told they would be served if they moved. Upon their failure to move, the store manager summoned the police, who ordered the petitioners to leave the lunch counter and, when they refused, arrested them for disturbing the peace. The manager did not ask them to leave the store. The Louisiana Supreme Court refused to review the convictions. The petitioners secured certiorari, contending, inter alia, that their convictions were not based on any evidence of guilt and were therefore unconstitutional under the rule of the Thompson case, supra. Mr. Chief Justice Warren, writing for the court, examined the language and construction of the Louisiana statute and the cases defining disturbing the peace and concluded (p. 169) "that Louisiana law requires a finding of outwardly boisterous or unruly conduct in order to charge a defendant with `foreseeably' disturbing or alarming the public." Rejecting the state's argument that the Louisiana courts had reinterpreted the statute, the court held that the petitioners' passive presence at the lunch counter was not evidence of boisterous or unruly conduct and thus not evidence of public disturbance *Page 343 
within the court's interpretation of Louisiana law. The court further held that even if the proscription encompassed peaceful and orderly conduct which might cause "imminent public commotion," there was nothing in the record to suggest that such commotion was imminent.
Since the defendants in the present cases have been found guilty of "conduct allegedly having a particular effect on a particular occasion under particular circumstances, it becomes necessary to appraise that conduct and effect by the particularity of evidence adduced." Frankfurter, J., concurring in the judgment in Garner, supra, 176. This is not the case of a proprietor who invites trade in some parts of his establishment and restricts it in another. Ibid. And unlike public restaurants, which have become a part of the public life of our communities, private business offices are not affected with a public interest. See Douglas, J., concurring in Garner, supra, 183. It may be that "[t]here is a deep-seated pattern of segregation of the races in Louisiana"; id., 179; but this is not now and has never been our pattern. In Garner, the "petitioners were sitting at these counters, where they knew they would not be served, in order to demonstrate that their race was being segregated in dining facilities in this part of the country." Harlan, J.,
concurring in the judgment, at 201. "Such a demonstration," Mr. Justice Harlan continued, "in the circumstances of these . . . cases, is as much a part of the `free trade in ideas,' . . . as is verbal expression, more commonly thought of as `speech.' It, like speech, appeals to good sense and to `the power of reason as applied through public discussion' . . . just as much as, if not more than, a public oration delivered from a soapbox at a street corner." But a man's private business office in downtown New Haven is hardly an appropriate forum in which *Page 344 
to stage a "sit-in" demonstration to remonstrate against what the defendants considered odious housing legislation. It is true that the conduct of the defendants was nonabusive, nonviolent and non-boisterous. What they did do was to create an annoying and offensive condition in private offices in downtown New Haven which could not, and did not, serve any legitimate purpose of theirs. "We do not think the statute gauges criminality by the impressions made on an annoyed or disgruntled citizen. Common sense . . . [dictates] that language or conduct is to be adjudged to be disorderly, not merely because it offends some supersensitive or hypercritical individual, but because it is, by its nature, of a sort that is a substantial interference with . . . the reasonable man." People v. Harvey,307 N.Y. 588, 592. "The trial court's finding is buttressed by the unfavorable inference it was entitled to draw from the . . . [defendants'] failure to make any explanation or denial of the prima facie case which the state had made out against [them]."State v. Andrews, 150 Conn. 92, 104, and cases cited. We cannot say that upon this record the court erred in concluding that the defendants' conduct fell within the proscription encompassed by the statute.
 There is no error.
In this opinion PRUYN and GEORGE, JS., concurred.