Joe Edward SMITH, Petitioner,

v.

The STATE OF TEXAS, Respondent.

Civ. A. No. 63–H–581.

United States District Court
S. D. Texas,
Houston Division.

Nov. 21, 1963.

See also 225 F.Supp. 158.

Thompson, Hippard & Gibson, James J. Hippard, Houston, Tex., for petitioner.

Sam Robertson, Jr., Ass't Dist. Atty., for Harris County, Tex., for respondent.

NOEL, District Judge.

Petitioner is again before this Court upon application for writ of habeas corpus. His first application was dismissed by this Court on May 7, 1962.[1] This dismissal was affirmed by the United States Court of Appeals for the Fifth Circuit on April 4, 1963.[2] Petitioner then applied to the Supreme Court of the United States for writ of certiorari. This application was likewise dismissed.

■ Finality was not achieved by the action of three federal courts upon petitioner's first application for writ of habeas corpus. The constitutional grounds asserted in his second application were not urged in his first. This Court must therefore consider those issues asserted for the first time in petitioner's second application. Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963).

The new grounds asserted by petitioner are:

(1) That the State failed to introduce evidence establishing all the basic elements of the crime charged, which under the teaching of Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) would make his conviction violative of the due process clause of the Fourteenth Amendment; and

(2) That the proof offered by the State did not fulfill the requirements of Texas law and, therefore,

---

1. See 214 F.Supp. 909 (S.D.Tex.1962). Joe Edward Smith, petitioner, was convicted of the capital offense of murder with malice aforethought in the Criminal District Court of Harris County, Texas, on April 14, 1960. The death penalty was imposed. Petitioner appealed to the Court of Criminal Appeals of Texas, which affirmed the conviction. See Smith v. State, 171 Tex.Cr.App. 313, 350 S.W.2d 344 (1961). A motion for rehearing was overruled without written opinion on March 29, 1961. A petition for certiorari to the United States Supreme Court was denied on October 16, 1961, Mr. Justice Douglas dissenting. Smith v. Texas, 368 U.S. 883, 82 S.Ct. 126, 7 L.Ed.2d 83 (1961). Petitioner then filed his application for writ of habeas corpus in this Court, which was denied. This Court, however, stayed his execution on February 27, 1962, pending final determination of his first petition for writ of habeas corpus. This final determination was consummated with the issuance by the Fifth Circuit of its mandate on November 6, 1963 affirming the action of this Court in dismissing the petition for writ of habeas corpus.

2. See 315 F.2d 692, 693 (5th Cir. 1963).

petitioner's conviction constituted a denial of equal protection of the law under the United States and Texas Constitutions.

Petitioner's state remedies were exhausted by the denial on November 7, 1963 of petitioner's petition for writ of habeas corpus to the Texas Court of Criminal Appeals.

Petitioner was to be executed in the early morning of November 8, 1963. But, since the contents of the petition suggested a careful examination of the trial record which had not been returned by the United States Court of Appeals for the Fifth Circuit, this Court on November 7, 1963 stayed petitioner's execution for thirty days.

■ The grounds asserted in petitioner's application were not such as required an evidentiary hearing within the purview of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Petitioner did not request an evidentiary hearing. Petitioner's counsel did request oral legal argument, to which he was not entitled as a matter of right but which this Court in the exercise of its discretion granted.

■ The Brief in Support of Petitioner's Application for Writ of Habeas Corpus and the Supplemental Brief in Support of Petitioner's Application for Writ of Habeas Corpus show that despite petitioner's reliance upon the holding of the United States Supreme Court in Thompson v. Louisville, supra, his actual contention is that the proof offered by the State did not meet the standards of proof required to sustain a conviction under Texas law. This ground encompasses such contentions by petitioner as the failure in the absence of direct evidence to introduce circumstantial evidence excluding every other reasonable

hypothesis except petitioner's guilt, failure to prove each of the essential elements of the offense beyond a reasonable doubt, the obtaining of the conviction by basing one inference upon another inference, and conviction without the introduction of sufficient quantitative evidence to justify rationally a finding as to every element of the crime charged. These contentions are nothing more than a request for an inquiry into or a weighing of the sufficiency of the evidence supporting a conviction, which is not within the province of a federal court in a habeas corpus matter.[3]

Petitioner in relying on Thompson v. Louisville, supra, as authority for these contentions, misinterprets the case.[4] There the Court said,

"The ultimate question presented to us is whether the charges against petitioner were so totally devoid of evidentiary support as to render his conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment. Decision of this question turns *not on the sufficiency of the evidence,* but on whether this conviction rests upon *any* evidence at all." (Emphasis added.)

In following and applying the Thompson rule, the court in Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed. 2d 207 (1961) said,

"As in Thompson v. City of Louisville * * * our inquiry does not turn on a question of sufficiency of evidence to support a conviction, but on whether these convictions rest upon *any* evidence which would support a finding that the petitioners' acts caused a disturbance of the peace." (Emphasis added.)

**3.** Price v. Henkel, 216 U.S. 488, 30 S.Ct. 257, 54 L.Ed. 581 (1910); Lacewell v. Hiatt, 173 F.2d 889 (5th Cir. 1949); Telfian v. Sanford, 161 F.2d 556 (5th Cir. 1947).

**4.** Petitioner's interpretation is "In the Thompson case, the Supreme Court

looked to the quantitative aspects of the evidence and held that the amount was insufficient to sustain conviction." Brief in Support of Petitioner's Application for Writ of Habeas Corpus, p. 10. See also Supplemental Brief in Support of Petitioner's Application for Writ of Habeas Corpus, pp. 2, 3.

■ There is a difference between a conviction based upon evidence deemed insufficient as a matter of state criminal law, as is petitioner's basic contention, and one so totally devoid of evidentiary support as to raise a due process issue. It is only in the latter situation that there has been a violation of the Fourteenth Amendment which would then afford a state prisoner a remedy in a federal court on writ of habeas corpus.[5]

Petitioner's contentions involving an inquiry into the sufficiency of evidence to support his conviction are not grounds for the issuance of a writ of habeas corpus. However, his contention, *if true,* that there is no evidence supporting an essential element of the crime of murder with malice aforethought for which he was charged and convicted,[6] would be a denial of due process under the teaching of Thompson v. Louisville, supra, for which a writ of habeas corpus would lie.

This contention is in essence that the State introduced no evidence that either petitioner or his co-indictee, Adrian Johnson, while preparing for or executing felonious acts of sodomy on the deceased, killed him by mistake or accident. The determination of this question required an extensive examination by this Court of the record made in the trial court. This Court carefully reviewed the entire trial court record before making its determination of petitioner's first petition for writ of habeas corpus and has now done so a second time in connection with this his second petition.

A summation of the evidence adduced against petitioner was prepared by First Assistant District Attorney Sam Robertson and stipulated as accurate and complete in open court by petitioner's counsel James J. Hippard. From my examination of the trial court record, I find independently of such stipulation that such summation is accurate and complete. The summation is attached to this opinion for convenience, as an Appendix.

It is necessary to examine the Texas law to determine the essential elements required to be proved in order to convict the petitioner. Article 42 of the Vernon's Ann.Texas Penal Code provides:

"One intending to commit a felony and who in the act of preparing for or executing the same shall through mistake or accident do another act which, if voluntarily done, would be a felony, shall receive the punishment affixed to the felony actually committed."

■ In his first brief filed in support of this petition, petitioner seems to contend that the only evidence which could be considered as supporting his conviction is evidence identifying either petitioner or his co-indictee, Adrian Johnson, as the person or persons who while preparing for or executing felonious acts of sodomy on the deceased through mistake or accident killed him.[7] This contention is apparently based on the belief that only persons jointly indicted may be considered principals in Texas. However, Article 65 of the Vernon's Ann.Texas Penal Code provides that "All persons are principals who are guilty of acting together in the commission of an offense." Article 65 does not declare

---

5. Faust v. North Carolina, 307 F.2d 869 (4th Cir. 1962); Grundler v. North Carolina, 283 F.2d 798 (4th Cir. 1960).

6. This contention is not clearly asserted by petitioner due to his misconception that Thompson v. Louisville, supra, calls for a determination of whether a sufficient quantity of evidence was introduced to justify rationally a finding as to every element of the crime charged. It is felt, however, that the question of

the existence of *any* evidence is present and is sufficiently raised to require consideration by this Court.

7. Petitioner may now admit that any evidence identifying any of the persons named in petitioner's confession as the responsible party or parties may be considered. See Supplemental Brief in Support of Petitioner's Application for Writ of Habeas Corpus, p. 3.

**154**

that all persons who are guilty of so acting together must be indicted in order for any one or more of them to be a principal.

The state trial judge charged the jury in part as follows:

"All persons are principals who are guilty of acting together in the commission of an offense, and principals, *whether jointly indicted or not*, may be legally prosecuted and convicted as such, provided the evidence adduced against each clearly and satisfactorily establishes the guilt of each. Where an offense has been committed, the true criterion for determining who are principals is, 'Did the parties act together in the commission of the offense? Was the act committed in pursuance of a common intent, and in pursuance of a previously formed design in which the minds of all united and concurred?' If so, then the law is that all are alike guilty, provided the offense was actually committed during the existence and in execution of the common design and intent of all."

■ It is not necessary that the charge of the trial court specifically identify persons as possible principals for the petitioner to be a principal with them under Texas law. See Johnson v. State, 169 Tex.Cr.R. 612, 336 S.W.2d 175 (1960). Therefore, petitioner would be a principal with any one with whom the evidence showed he was acting in the commission of the offense of sodomy. By his own confession, petitioner was acting together with Ira Lee Sadler, Adrian Johnson, David Clemons and Charles Archer.

■ It is not necessary that *any* evidence be presented proving that petitioner was the one who directly and independently, or acting only with Johnson, caused the death of the child. It would be and is sufficient if *any* evidence were presented that petitioner was acting with *others* as a principal in the commission of the offense of sodomy and that while preparing for or executing such felonious offense he or one or more of his principals caused the death by mistake or accident.

■ I find that not only is there *any* or *some* evidence to support this element, there is ample evidence from which a jury could rationally convict. Petitioner's confession standing alone, the voluntariness of which has been previously determined by the jury and this Court, is evidence that petitioner as principal with Adrian Johnson, Ira Lee Sadler, David Clemons and Charles Archer committed felonious anal sodomy on the decedent.

Robert L. Crawford, a chemist and toxicologist, testified that he found in the right hip pocket of trousers worn by Sadler a human hair which was identical in its characteristics to hairs removed from the body of the deceased and that all of the hairs very probably could have come from the same person. He further testified that he examined and photographed the bodies of petitioner and Adrian Johnson and that on the underneath side of the penis of each, near the head, he found a bruise.

Dr. Jachimczyk, Harris County Forensic Pathologist, testified that he examined the body of the decedent and found two bruises on the neck, one on each side; a bruise above each of the buttocks; star-shaped tears in the anus and rectum at the anal-rectal junction; stretching of the anal orifice in the lane of the junction of the anus and rectum; material resembling sperm heads from smears made of rectum of the deceased; a tear in the left leaf of the diaphragm; a rupture in the top side of the stomach; and, the stomach content moved into the left chest cavity which resulted in partial compression of the left lung. Dr. Jachimczyk expressed the unqualified opinion that the cause of death was asphyxia due to suffocation in association with sodomy. This opinion was not weakened in the slightest by cross-examination. No opinion to the contrary was offered by petitioner.

Dr. Jachimczyk also expressed the opinion that bruises on the neck of the deceased could have been caused by chok-

ing; that the tear in the diaphragm could have been caused by decedent's chest being crushed with a "bear hug"; that the injuries to the anus could have been caused by the insertion of an erected penis into it; that the bruised condition of the penises of petitioner and Johnson, as reflected in the photographs, could have been caused by their insertion while erected into a small or tight opening; and that the bruises on the penises could not have been self-inflicted. The Doctor further testified that the injuries to decedent would have caused his death within a few minutes regardless of whether he had been placed in the refrigerator.

I find evidence was introduced that petitioner as principal with others committed felonious sodomy and that he or one or more of his principals while executing or preparing for this felony accidentally killed the deceased. I also find that this evidence was direct and not such that it was necessary for the jury to pile one inference upon another inference in order to convict petitioner.

Petitioner further asserts that the acts of two other persons could have caused the deceased's death, for which acts he would not be responsible. Petitioner contends that these two, Robert Leroy Miller and his brother, Roy Miller, since not mentioned in his confession and since there was no evidence according to petitioner to indicate their participation in a common purpose, could not be principals with him. I am of the opinion, however, that a principal relationship between petitioner and the Miller brothers is not precluded by his failure to mention them in his confession, and that other evidence does indicate their participation with petitioner in the felonious sodomy.

Arthur Breitkreuz, Jr. testified that he saw petitioner near the scene of the murder with Sadler, Johnson and Roy Miller at approximately 5:30 p. m. on the day of the murder. Robert F. Crawford, chemist and toxicologist, testified that a spot of fecal material and several spots of blood of the decedent's type were found on Roy Miller's clothing. He also testified that he examined and photographed the body of Robert Leroy Miller, just as he had petitioner's and Johnson's, and had also discovered a bruise on the underneath side of his penis, near the head. Dr. Jachimczyk examined the photograph of Miller when he examined that of petitioner and Johnson and concluded that each of the bruises could have resulted from the insertion of an erected penis into a tight opening.

I am of the opinion that the aforementioned evidence demonstrates that petitioner was a principal with the Miller brothers in the commission of felonious sodomy upon the deceased.

However, even though I am incorrect in considering the Miller brothers, or even the persons mentioned in the confession other than Johnson,[3] as principals with petitioner, nonetheless, there is evidence within the gambit of the Townsend case that either petitioner or Johnson was responsible for the death of the decedent. While this evidence might not be sufficient to establish petitioner's guilt beyond a reasonable doubt or to the exclusion of any other reasonable hypothesis such as that the Miller brothers might have accidentally killed decedent while committing sodomy, that is not the appropriate test. A writ of habeas corpus does not lie to test the sufficiency of the evidence; it will issue *only if there is no evidence at all.* And that just is not the case here.

Therefore, the petition of Joe Edward Smith for a writ of habeas corpus is denied.

### APPENDIX

In his confession the petitioner states that on July 20, 1959, at approximately 5:00 p. m. he and Ira Lee Sadler (his brother), Adrian Johnson, David Clemons, and Charles Archer were walking around in the "Fourth Ward" and at

8. Petitioner has always admitted that Johnson was his principal. See Brief in Support of Petitioner's Application for Writ of Habeas Corpus, p. 5.

approximately 6:00 p. m. they started home; that they proceeded home on West Gray and when they reached a pet shop on West Gray by Dunlavy Street, Charles Archer hit a white boy that was on a bicycle and knocked him off of it; that this white boy looked to be about ten or eleven years old; that he and Adrian Johnson grabbed the little boy and packed him across the street to the other side and then David Clemens got the little boy, picked him up and packed him to the little house sitting on a dirt yard lot; that Archer was holding the little boy's mouth to keep him from hollering, and then took him inside the little house after Adrian Johnson had opened the door; that they all went inside the little house and that Ira Sadler brought the little white boy's bicycle over to the little house; that David Clemons pulled the little white boy's pants off and Archer took the rest of his clothes off; that Clemons started "screwing the white boy in the ass"; that after he got through then Johnson "got on him and screwed the white boy the same way"; that after Johnson got through "then I got on the boy and screwed him in the ass"; that after "I got finished screwing the boy Charles Archer got on him and started screwing the white boy the same way"; at which time he then went outside and that about ten minutes later Johnson, Clemons, and Archer came out of the little house running, and that later on that same night Clemons told the petitioner that Johnson and Archer had placed the little white boy in the ice box that was inside the house.

A. B. Overstreet, a witness for the State, testified that on July 20 he was employed by the St. Louis Terminal Warehouse, located at 1703 West Gray. He identified petitioner as one of the boys with Ira Lee Sadler whom he had seen and asked to move on when they stopped by his place during the afternoon of July 20, 1959, coming from the west, going east.

Arthur Breitkreuz, Jr., a witness for the State, testified that he was employed by the Houston Chronicle newspaper as a distributor; that on July 20, 1959, he saw the petitioner at the corner of Angelo and West Clay with Ira Lee Sadler, Adrian Johnson and Roy Miller at approximately 5:30 p. m.

Jimmy Ray Amos, a witness for the State, testified that he was a Baptist minister and the manager of the Chuck-Wagon, a hamburger stand located at the corner of Dunlavy and Gray Streets; that he was at his place of business on July 20, 1959, where he saw the petitioner at two different times; that the first time he saw the petitioner was at approximately 6:00 p. m., there in front of his place of business making a purchase, and at that time petitioner was with a group of boys, one of whom the witness identified as Adrian Johnson. He further testified that the boys then left, at that time walking west toward Shepherd Drive; that approximately five or ten minutes later, they returned from the same direction in which they had left and made another small purchase and walked east, away from his establishment, toward Waugh Drive. He further testified that his business establishment was only a very short distance west of the dirtyard where the metal shack was located.

A. E. Rockwell, a witness for the State and police officer with the City of Houston Homicide Division, testified that in connection with this case he went to the address of 1217 McDuffie Street, where he recovered clothing belonging to the petitioner and Ira Lee Sadler, which clothing was given to him by the mother of the petitioner, and which he in turn delivered to Mr. Crawford.

J. H. Jones, a witness for the State and police officer with the Homicide Division of the Houston Police Department, testified that he arrested the Miller brothers in connection with this offense and recovered some clothing from them which he turned over to Robert F. Crawford, the City Chemist and Toxicologist.

Robert F. Crawford, a witness for the State and a chemist and toxicologist for the City of Houston Police Department, was qualified as an expert witness in the field of chemistry and toxicology. He

then testified that he obtained from the deceased a blood sample which he found to be type or group "O", and he also obtained hair from the head, pubic region and anal region of the deceased. He testified that Officers A. E. Rockwell and J. H. Jones had turned over to him clothing which he examined. He testified that his examination of the clothing of Ira Lee Sadler, turned over to him by Officer Rockwell, and also the clothing of the Miller brothers, turned over to him by Officer Jones, revealed that "on the clothing of Roy Miller's blue jeans at the right top fly in front of the trousers was a spot, approximately the size of a nickel, of fecal material," which he explained was the human waste product that is eliminated from the bowels; that upon the clothing of Roy Miller he found several spots of blood down the left front trouser leg of the blue jeans, which was of Group "O", the same type as that of the deceased boy; that in the right hip pocket of the trousers worn by Ira Lee Sadler was a human hair which he compared to that removed from the deceased; that the microscopic examination of the hairs revealed they were identical in all respects.

He further testified that between 11:00 a. m. and 1:00 p. m. on July 24, 1959, he examined and took photographs of the entire bodies of the petitioner, Adrian Johnson and Robert Leroy Miller; that on the petitioner: "on the underneath side of his penis near the head I found what appeared to be an abrasion or a bruise, which was close to the head of the penis," which bruise he recorded in colored photographs introduced into evidence as State's Exhibits No's. 23 and 24.

He testified that he also conducted a complete examination of the body of Adrian Johnson, including the private parts, and likewise, on him "there was a bruised area on the underneath side of his penis," which injury he recorded in photographs introduced into evidence as State's Exhibits No's. 25 and 26.

He further testified that he also conducted a complete examination of Robert Leroy Miller, and "on the underneath side of his penis I found an abrasion, close to the head of the penis," which he recorded with colored photographs identified and introduced into evidence as State's Exhibits No's. 27 and 28.

Dr. Jachimczyk, a witness for the State and Harris County Forensic Pathologist, after being qualified as an expert witness in that field, testified that at approximately 10:20 a.m. on July 21, 1959, he went to the 1500 block of West Gray where he found inside a refrigerator the nude body of a twelve year old white boy in a sitting position with his back to the left side and his knees to the right side of the refrigerator, the right hand across the abdomen and the left hand "sort of underneath" the left buttocks and the head was turned toward the right of the body. He testified that on the "down side of the body" there was "dependent lividity" which means a discoloration on the interior. He testified that in the middle of the forehead there were two scratches and that there were scratches on the right upper arm, the left forearm and the top side of the left hand; that there were cuts on both of the knee caps; that there was a scratch on the outside of the left shin; two bruises just above each of the buttocks on each side; that there were several black and blue discolorations below the knees and on the upper outer aspect of the left upper arm; that there were also two bruises on each side of the neck on the outside of the skin. He testified that an internal examination revealed "a tear in the left leaf of the diaphragm, a rupture in the fundus or top side of the stomach which measured two inches in diameter" and that the stomach content was in the left chest cavity and partially compressing the left lung. He testified that "in the anus and rectum at the anal-rectal junction there were stellete star-shaped tears"; that in the lane of the junction of the anus and rectum there was a stretching of the anal orifice itself and there was some hemorrhage too. He further testified that from his autopsy he was able to determine the

158

cause of death to be "asphyxia due to suffocation in association with sodomy." He expressed the opinion that the injuries on each side of the neck could have been caused by a person being choked and that the tear in the diaphragm could have been caused by a person's chest being crushed with a "bear hug." He further testified that the injuries to the anus could have been caused by a person inserting an erected penis into the little boy's anus. He testified that from his examination the cause of the asphyxia which caused the death of the deceased was the pressure on the neck and the left chest. He testified that from the smears he made of the rectum of the deceased he saw material "very strongly suggested as sperm heads," but that in view of the fact that he was not able to find any "tails" he could not form a definite conclusion. He further testified that from his examination of the deceased he could state unequivocally that the injuries were very painful and that also there was very marked resistance on the part of the deceased. Dr. Jachimczyk further testified that the injuries to the person of the deceased would have caused his death within a matter of several minutes irrespective of whether he had been placed in the refrigerator. He examined State's Exhibits No's. 23, 24, 25, 26, 27 and 28, and observed the bruised condition of the penis as reflected on each of the photographs and expressed the opinion that the injuries to the penis as reflected in each of the photographs was such that could have been caused by inserting the penis into a small or tight opening and that to sustain that type injury the penis, had to be in an "erected state" and that such injuries were not self-inflicted.

Millard L. Bates, Jr., a witness for the State, testified that on July 20, 1959, "shortly after 6:00 o'clock p. m." he and his young son pulled into the Chuck-Wagon at the corner of West Gray and Dunlavy Street to get a sandwich as they were on their way to the Post Oak Drive-In theater; that his young son went to the window to place the order and continued to wait there until it was ready; that as his little son was standing there he saw the petitioner and a group of Negro boys walk by about eight or ten feet from him and heard the petitioner at that time say "Let's get the white boy when he leaves here" and that at that time the group of colored boys was going east on the north side of West Gray Street; and that shortly thereafter he saw the deceased get on his bicycle there at the Chuck-Wagon and ride down the street in the same direction in which the petitioner and his companions had gone.